**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SUZANNE GREEN,<br><br>Plaintiff,<br><br>v.<br><br>TIDALHEALTH PENINSULA REGIONAL, *et al.*,<br><br>Defendants. | Civil Case No. 1:26-cv-02916-JKB |

**DEFENDANT TIDALHEALTH PENINSULA REGIONAL, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Larry R. Seegull (Bar No. 22991)
Jill Distler (Bar No. 26166)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
410.415.2000 (telephone)
410.415.2001 (facsimile)
larry.seegull@jacksonlewis.com
jill.distler@jacksonlewis.com

*Counsel for Defendant TidalHealth Peninsula Regional, Inc. d/b/a McCready Pavilion*

## TABLE OF CONTENTS

I. INTRODUCTION…………………………………………………………………...1

II. BACKGROUND……………………………………………………………………….2

A. TidalHealth Hired Plaintiff As Senior Director of Practice Operations……….....2

B. During Her Employment, Plaintiff Conducted Audits Regarding Provider Schedules And Use Of PTO, And Those Audits Were Within The Scope Of Her Auditing And Compliance Duties As Senior Director Of Practice Operations…………………………………………………………..2

1. Plaintiff's Audit Of Provider Schedules Determined Providers Did Not Work Full Patient Loads As Expected………………………………...3

2. Plaintiff's Audit Of Provider Time Off Showed Providers Taking Excessive Time Off And Not Deducting Their PTO………………………3

C. Plaintiff Claims That She "Believed" The Practices She Identified In Her Audits Violated The Federal Anti-Kickback Statute And The Stark Law…………4

D. Plaintiff Reported Her Audit Findings To TidalHealth……………………………4

E. Cindy Lundsford Asked Plaintiff About A Florida News Article That Referenced Criminal Charges Brought Against Plaintiff In Florida……………………………5

F. TidalHealth Terminated Plaintiff's Employment For "Operational Issues"………6

III. STANDARD OF REVIEW……………………………………………………………..6

IV. ARGUMENT……………………………………………………………………...…8

A. Count I – The Complaint Fails To State A Claim Of Retaliation In Violation Of The False Claims Act Upon Which Relief Can Be Granted……………………8

1. The Complaint Does Not Allege Facts To Plausibly Satisfy The First Element – Plaintiff Never Reported A Claim Under The FCA Or Otherwise Engaged In Protected Activity………………………………..10

a) The Complaint Does Not Identify Any False Claim That Was Submitted To The Government Or That Plaintiff Reasonably Believed Would Be Submitted To The Government……………..10

b) The Complaint Does Not Sufficiently Allege That Plaintiff Reasonably Believed There Were Violations Of The Anti-Kickback Statute Or The Stark Law That Could Support Her FCA Retaliation Claim……………………………………….11

c) Plaintiff's Concerns Did Not Relate To The AKS……………….12

d) Plaintiff's Audit Finding Did Not Relate To Referrals Or The Stark Law……………………………………………………13

e) Plaintiff Conducted The Audits, And Reported Her Findings To TidalHealth, As Part Of Her Audit and Compliance Role As Opposed To Because She Had A Belief That TidalHealth Was Violating The FCA……………………………………………….14

2. The Complaint Does Not Allege Facts To Plausibly Satisfy The Second Element Of An FCA Claim - There Are Insufficient Allegations That TidalHealth Viewed Plaintiff As A Whistleblower…………………15

B. Count II – Plaintiff's Complaint Fails To State A Fair Credit Reporting Act Claim Upon Which Relief Can Be Granted……………………………………….16

1. The FCRA Only Governs The Procurement Of "Consumer Reports"……16

2. The Complaint Makes Only Conclusory, Speculative Allegations Regarding A "John Doe Reporting Agency," And Any Claim Based On An Unidentified, "John Doe" Agency Fails………………………………18

3. Plaintiff's Alternative Theory Also Fails Because Internet Searches By TidalHealth Employees Do Not Constitute Consumer Reports And Are Not Governed By The FCRA…………………………………………………18

C. Count IV – Plaintiff's Complaint Fails To State A Claim For Wrongful Discharge In Violation Of Maryland Public Policy………………………………20

1. Wrongful Discharge Is A Narrow Exception To At-Will Employment…..21

2. The Complaint Does Not Allege Sufficient Facts To Establish That § 10-109 Contains A Broad Pronouncement Of Public Policy Or That It Even Applies To The Facts Alleged By Plaintiff…………………………22

a) Section 10-109 Prohibits Certain Conduct With Respect To *Police Or Court Records* Expunged *Under Maryland Law*………23

b) The Complaint Does Not Allege Facts To Establish That TidalHealth Otherwise Engaged In Any Of The Conduct Prohibited By § 10-109……………………………………………25

c) Maryland Public Policy Simply Does Not Prohibit Reliance On News Articles About Past Criminal Convictions…………………27

V. CONCLUSION……………………………………………………………………..27

## I. INTRODUCTION

Plaintiff, Suzanne Green ("Plaintiff") filed this lawsuit against her former employer, TidalHealth Peninsula Regional, Inc. ("TidalHealth").[1] Plaintiff's Complaint alleges that in the scope of her role with TidalHealth, she identified certain physician scheduling and time off issues that she reported to TidalHealth. She further alleges that TidalHealth then confronted her with a public news article that TidalHealth personnel located regarding her prior arrest in Florida for theft and fraud. She speculates that the news article was somehow obtained with the assistance of a consumer reporting agency, the identity of which she admits is not known to her and which she refers to in her Complaint as John Doe Reporting Agency ("John Doe CRA"). Plaintiff further claims that TidalHealth then terminated her employment.

Her Complaint contains the following claims:

- <u>Count I</u> – retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), against TidalHealth;
- <u>Count II</u> – violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681b, 1681m, against TidalHealth;
- <u>Count III</u> – violation of the FCRA, 15 U.S.C. §§ 1681e(b), 1681k, against John Doe CRA.
- <u>Count IV</u> – wrongful discharge in violation of Maryland public policy, against TidalHealth.

For the reasons discussed below, all counts against TidalHealth (Counts I, II, and IV) should be dismissed for failure to state claims upon which relief can be granted.

---

[1] The caption of Plaintiff's Complaint states "TidalHealth Peninsula Regional, its affiliates, subsidiaries, and other related entities, under any name by which they are known," but it does not name any of those supposed affiliates, subsidiaries, or related entities.

## II. BACKGROUND[2]

### A. TidalHealth Hired Plaintiff As Senior Director Of Practice Operations.

TidalHealth is a healthcare organization. (Compl. ¶ 6.) In Fall of 2025, while Plaintiff was residing in Florida, TidalHealth recruited her to work in an auditing and compliance role at its Salisbury, Maryland facility. (Compl. ¶¶ 5, 14-15, 17.) Before hiring Plaintiff, TidalHealth "conducted a pre-employment background investigation of [Plaintiff] consistent with its standard screening policy, which provides for a ten-year lookback period." (Compl. ¶ 18.) The results of that investigation were satisfactory, and TidalHealth hired Plaintiff. (Compl. ¶ 18.) Plaintiff, therefore, moved from Florida to Millsboro, Delaware, and she began working at TidalHealth on December 1, 2025, in the role of Senior Director of Practice Operations. (Compl. ¶¶ 12, 15-17.) She commuted daily from her Delaware residence to TidalHealth's Salisbury, Maryland facility. (Compl. ¶¶ 5, 17.)

### B. During Her Employment, Plaintiff Conducted Audits Regarding Provider Schedules And Use Of PTO, And Those Audits Were Within The Scope Of Her Auditing And Compliance Duties As Senior Director Of Practice Operations.

In her role of Senior Director of Practice Operations, which Plaintiff explicitly characterizes as an "auditing and compliance role," Plaintiff "was responsible for ensuring regulatory compliance including compliance with the Health Insurance Portability and Accountability Act ('HIPAA')." (Compl. ¶¶ 12, 14.) The Complaint alleges that within months of her hire, she "performed precisely the work for which she was retained: she identified and internally reported significant financial improprieties and operational deficiencies within

---

[2] The facts alleged in the Complaint are accepted as true for the purposes of this Motion to Dismiss only.

TidalHealth's organization." (Compl. ¶ 2.) The Complaint admits that this was done "in the ordinary course of her auditing and compliance duties." (Compl. ¶ 19.)

### 1. Plaintiff's Audit Of Provider Schedules Determined Providers Did Not Work Full Patient Loads As Expected.

Plaintiff, "as part of her role, conducted an audit of provider schedules." (Compl. ¶ 24.) The Complaint claims that standard office hours were from 8 a.m. to 5 p.m., and that TidalHealth's providers were expected to see patients from approximately 8 a.m. to 12 p.m. and 1 p.m. to 4:30 p.m., with administrative time built into their schedules. (Compl. ¶ 25.) The Complaint further alleges that, based on provider contracts, providers were "expected to perform 34-36 hours of "face-to-face patient care each week with four to six (4-6) hours of administrative time." (Compl. ¶ 26.) Plaintiff's audit allegedly revealed that (1) approximately 85-90% of providers were only working 24 to 28 patient care hours per week, which is below their contractual obligations, and (2) providers blocked their schedules so that patient appointments did not begin until 9 a.m. and ended as early as 3:30 p.m., thus reducing patient access and organizational revenue. (Compl. ¶¶ 27-28.)

### 2. Plaintiff's Audit Of Provider Time Off Showed Providers Taking Excessive Time Off And Not Deducting Their PTO.

Further acting in her "official capacity," Plaintiff conducted an audit of provider time off beginning in 2025.[3] (Compl. ¶ 29.) Her audit allegedly revealed that (1) "providers were taking half-days, full days, and even extended periods away from work without properly recording their leave in the payroll system," which resulted in paid time off not being "deducted from their PTO banks while they continued receiving their regular compensation," (2) "at the end of 2025,

[3] As stated above, Plaintiff did not commence her employment until December 1, 2025. (Compl. ¶ 17). Thus, Plaintiff was not even able to begin conducting this audit until very late in 2025 and, therefore, conducted it in a short period of time.

providers and employees who were absent from work received additional PTO payouts in situations where leave had not been properly recorded," and (3) "certain neurologists and neurosurgeons were earning compensation in excess of eight hundred and fifty thousand dollars ($850,000) annually while averaging approximately fifteen (15) hours of patient care per week." (Compl. ¶¶ 30-33.)

### C. Plaintiff Claims That She "Believed" The Practices She Identified In Her Audits Violated The Federal Anti-Kickback Statute And The Stark Law.

The Complaint alleges that Plaintiff believed the practices Plaintiff identified in her audits violated the federal Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b) and the federal physician self-referral law (the "Stark Law"), 42 U.S.C. § 1395nn. (Compl. ¶ 22.) The Complaint alleges that Plaintiff "questioned" whether the physician compensation arrangements in the neurology department potentially exceeded fair market value and whether the retention of highly compensated physicians was for reasons other than for the clinical services they provided (*e.g.*, such as to maintain the hospital's trauma center designation). (Compl. ¶ 22.)

### D. Plaintiff Reported Her Audit Findings To TidalHealth.

In or about February 2026, Plaintiff reported her audit findings to members of TidalHealth's directors and executive leadership and advised that TidalHealth's Human Resources functions should be involved in addressing the issues she had identified. (Compl. ¶ 36.) The Complaint alleges that, rather than investigate or address her findings, on March 12, 2026, TidalHealth's Chief Administrative Officer, Tres Pelot, directed her to stop looking into the issues she had raised. (Compl. ¶ 37.) Plaintiff was also informed that "leadership wanted to preserve the service line despite the financial impact." (Compl. ¶ 34.) Further, the Complaint claims that during discussions regarding her audit findings, Vice President of Finance Jim Kanuck commented that there appeared to be "Stark issues" associated with the providers' arrangements. (Compl. ¶

34.) "Stark" is apparently a reference to the Stark Law, 42 U.S.C. § 1395nn, a "federal physician self-referral law." (Compl. ¶ 22.)

### E. **Cindy Lundsford Asked Plaintiff About A Florida News Article That Referenced Criminal Charges Brought Against Plaintiff In Florida.**

On March 23, 2026, Cindy Lundsford, TidalHealth's Executive Vice President/Chief Operations Officer and President, met with Plaintiff and "opened a file that contained an outdated and obscure TCPalm news article." (Compl. ¶¶ 41-42.) The TCPalm news article to which the Complaint refers is attached hereto as Exhibit 1 and available at https://archive.tcpalm.com/news/vero-beach-woman-former-stuart-ceo-facing-fraud-and-theft-charges-ep-381976382-342995152.html/. The article, dated September 17, 2012, is from a Florida news site and is titled, "Vero Beach woman, former Stuart CEO, facing fraud and theft charges."

The article states that, as of September 17, 2012, Plaintiff was "facing fraud and theft charges after state insurance investigators said she received payments for submitting fraudulent claims, according to an arrest report." (Exhibit 1.) Although Plaintiff's Complaint states that the article referenced an "expunged record" (Compl. ¶ 42), there is nothing in the article that in any way suggests that the record was expunged. (Exhibit 1.) The Complaint alleges that Ms. Lundsford asked Plaintiff about the contents of the article, to which Plaintiff responded, "You did a background check on me. I passed my background check." (Compl. ¶ 42.) The Complaint further claims that, on March 27, 2026, Ms. Lundsford again asked Plaintiff about her criminal history, to which Plaintiff again responded, "You did a background check on me. I passed my background check." (Compl. ¶¶ 43-44.)

According to a public website, mugshots.com, Plaintiff was sentenced on July 18, 2013, for theft and fraud charges and placed on felony probation for five years. (*See* Exhibit 2, which is

also available at https://mugshots.com/US-States/Florida/Martin-County-FL/Suzanne-Green.69204715.html.)

### F. TidalHealth Terminated Plaintiff's Employment For "Operational Issues."

Ms. Lundsford subsequently presented Plaintiff with a severance agreement that referenced "operational issues." (Compl. ¶ 45.) After Plaintiff was let go, Tres Pelot, Chief Administrative Officer and Plaintiff's supervisor, allegedly told Plaintiff, "For what it's worth, you did a great job, too good a job." (Compl. ¶ 45.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss claims in a complaint for "failure to state a claim upon which relief can be granted." A motion to dismiss tests the sufficiency of the complaint. *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To survive a motion to dismiss, a plaintiff is obligated to "provide the grounds of his entitlement to relief," including "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Ogueri v. Kinney*, 2024 U.S. Dist. LEXIS 30101, at *4-5 (D. Md. Feb. 22, 2024). A complaint may withstand a motion to dismiss if it contains plausible factual allegations that demonstrate something more than the "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "requires more than labels and conclusions…a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Although a court evaluating a motion to dismiss must assume that all facts in the complaint are true, it need not accept unsupported legal allegations or accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).

Conclusory assertions are insufficient. *See Giarratano*, 521 F.3d at 304. A complaint's factual allegations "must be enough to raise a right to relief above the speculative level…on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, the facts alleged in the complaint must render the claim "plausible on its face" by enabling the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

It is well-settled that in ruling on a motion to dismiss, courts are permitted to consider documents outside of the Complaint which are referenced in, or integral to, the allegations in the Complaint, as well as matters of public record, without converting the motion into a summary judgment motion. *See Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that in reviewing a Rule 12(b)(6) dismissal, the court can consider documents attached to a motion to dismiss, as long as those documents are "integral to the complaint and authentic" and that the court also can "take judicial notice of matters of public record"). Accordingly, the Court can consider the TCPalm news article, attached hereto as Exhibit 1, without converting TidalHealth's motion into a motion for summary judgment. The article is specifically referenced in the Complaint (Compl. ¶ 42) and, therefore, is integral to the Complaint. Furthermore, the article is a matter of public record, given that it is located on a public website that this Court and the public can easily access. *See* https://archive.tcpalm.com/news/vero-beach-woman-former-stuart-ceo-facing-fraud-and-theft-charges-ep-381976382-342995152.html/. Likewise, the publicly available website page (https://mugshots.com/US-States/Florida/Martin-County-FL/Suzanne-Green.69204715.html) attached as Exhibit 2 is a matter of public record of which this Court may take judicial notice. Fed. R. Evid. 201(b)(2). TidalHealth offers Exhibits 1 and 2 only

for the fact that the information was published and is publicly of record – the fact bearing on what TidalHealth personnel could locate – and not for the truth of the matters reported therein.

## IV. ARGUMENT

### A. Count I – The Complaint Fails To State A Claim Of Retaliation In Violation Of The False Claims Act Upon Which Relief Can Be Granted.

The False Claims Act ("FCA") "protects the government against false claims that are presented to it in federal contracts." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018). Specifically, it prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2).

The FCA also prohibits retaliation. Specifically, the anti-retaliation provision of the FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Count I alleges that TidalHealth violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h), by terminating Plaintiff's employment in retaliation for internally reporting her audit findings. Plaintiff's Complaint alleges that Plaintiff made internal reports concerning her

audit findings, namely physician compensation arrangements in the Neurology department that she believed exceeded fair market value, as well as provider scheduling and timekeeping irregularities, and that Plaintiff suspected that these practices constituted violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the federal physician self-referral law (the "Stark Law"), 42 U.S.C. § 1395nn. (Compl. ¶ 22.) In an attempt to tie this alleged activity to the FCA and manufacture an FCA retaliation claim, the Complaint makes the broad, conclusory allegations that TidalHealth "submits claims for payment to federally funded healthcare programs, including Medicare and Medicaid," and that Plaintiff reasonably believed that the practices she had identified "had resulted in, or would result in, the submission of false or fraudulent claims to federal healthcare programs, fraudulently maintaining the hospital's trauma center designation, and [that] she undertook efforts to stop those violations, including by investigating, documenting, and internally reporting them." (Compl. ¶¶ 23, 35, 65.) The Complaint, therefore, generally alleges that Plaintiff's internal reports regarding her audit findings constituted protected activity under the FCA because her reports constituted efforts to stop one or more violations of the FCA.

To plead retaliation under the FCA, a plaintiff must allege that: (1) she engaged in protected activity; (2) her employer knew about the protected activity; and (3) the employer took adverse action against her as a result. *See LeVerette v. Louis Berger United States, Inc.*, No. 22-1891, 2024 U.S. App. LEXIS 12419, at *2 (4th Cir. May 23, 2024) (per curiam) (citing *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013)); *Smith v. Clark/Smoot/Russell, AJV*, 796 F.3d 424, 433 (4th Cir. 2015). For the reasons discussed below, the Complaint fails to state an FCA retaliation claim upon which relief can be granted because it does not allege sufficient facts to demonstrate that Plaintiff engaged in protected activity under the FCRA, and because it does not allege facts demonstrating that TidalHealth knew of any such protected activity.

### 1. The Complaint Does Not Allege Facts To Plausibly Satisfy The First Element — Plaintiff Never Reported A Claim Under The FCA Or Otherwise Engaged In Protected Activity.

With respect to the first element, the FCA defines two types of "protected activity": acts "in furtherance of an [FCA action]" (the "first prong") or "other efforts to stop 1 or more [FCA violations]" (the "second prong"). 31 U.S.C. § 3730(h)(1). In her Complaint, Plaintiff reliefs on the second prong and alleges that by reporting her audit findings, she was engaged in efforts to stop one or more FCA violations. The Fourth Circuit applies an "objective reasonableness standard for protected activity" under that second prong. *Grant*, 912 F.3d at 201. Under that standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* "A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.* "[W]hile the plaintiff's actions need not 'lead to a viable FCA action,' . . . they must still have a nexus to an FCA violation." *Id.*

#### a) The Complaint Does Not Identify Any False Claim That Was Submitted To The Government Or That Plaintiff Reasonably Believed Would Be Submitted To The Government.

The Complaint does not sufficiently allege facts to satisfy the objective reasonableness standard or to tie any of Plaintiff's actions to an FCA violation. The Complaint makes broad, conclusory allegations that TidalHealth "submits claims for payment to federally funded healthcare programs, including Medicare and Medicaid," and that Plaintiff reasonably believed that the practices she had identified "had resulted in, or would result in, the submission of false or fraudulent claims to federal healthcare programs, fraudulently maintaining the hospital's trauma

center designation, and she undertook efforts to stop those violations, including by investigating, documenting, and internally reporting them." (Compl. ¶¶ 23, 35, 65.) The Complaint, however, does not identify ***any*** false claim that was submitted to the government or that Plaintiff reasonably believed would be submitted to the government. As such, she has failed to satisfy the objective reasonableness standard. *See Carlson v. DynCorp Int'l LLC*, 657 Fed. Appx. 168, 173-74 (4th Cir. 2016) (affirming dismissal of FCA retaliation claim where the complaint did not contain enough factual matter to suggest that the employer made or was about to make a false claim to the government and, as a result, plaintiff's alleged belief that fraud had occurred or was going to occur was "entirely speculative" as opposed to objectively reasonable).

**b) The Complaint Does Not Sufficiently Allege That Plaintiff Reasonably Believed There Were Violations Of The Anti-Kickback Statute Or The Stark Law That Could Support Her FCA Retaliation Claim.**

In an attempt to manufacture an FCA retaliation claim, the Complaint alleges that Plaintiff reasonably believed that the issues she had identified during her audits violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b) and the federal physician self-referral law (the "Stark Law"). The Complaint makes the conclusory allegation that "[c]laims for items or services resulting from a violation of the Anti-Kickback Statute constitute false or fraudulent claims for purposes of the False Claims Act" and that "[c]laims arising from referrals prohibited by the Stark Law are likewise not properly payable by federal healthcare programs." (Compl. ¶ 23.) The Complaint, however, does not allege sufficient facts to demonstrate that Plaintiff had an objectively reasonable belief that the issues uncovered during her audits established a violation of either the AKS or the Stark Law.

### c) <u>Plaintiff's Concerns Did Not Relate To The AKS.</u>

The AKS prohibits knowingly and willfully soliciting, receiving, offering, or paying any remuneration – directly or indirectly, overtly or covertly, in cash or in kind – to induce or reward referrals for items or services under federal healthcare programs. 42 U.S.C. § 1320a-7b(b). The AKS further states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the [FCA]." *Id.* § 1320a-7b(g). Here, however, the Complaint fails to allege facts to establish the applicability of the AKS to Plaintiff's audit findings.

The elements of an AKA violation are: "(1) there was remuneration (2) offered or paid by the defendants, (3) with the requisite knowing-and-willful intent that at least one purpose of the remuneration was to induce referrals (4) for items or services payable under a federal healthcare program." *United States ex rel. Kyer v. Thomas Health Sys.*, 178 F.4th 119, 136 (4th Cir. 2026). Plaintiff's Complaint does not allege facts to demonstrate these elements or to otherwise establish that she had an objectively reasonable belief that any violation of the AKS was occurring and would lead to a violation of the FCA. For example, there are no allegations that TidalHealth offered or paid any renumeration to induce any referrals for items or services under Medicare or Medicaid. Because the Complaint does not sufficiently plead facts to establish that Plaintiff had an objectively reasonable belief that TidalHealth was violating the AKS, Plaintiff's FCA retaliation claim cannot be based on the AKS. *See Cox v. Red Hat, Inc.*, 2024 U.S. Dist. LEXIS 5643, at *33-34 (E.D. Va. Jan. 9, 2024) (in dismissing plaintiff's FCA retaliation claim, the court found that plaintiff had not plausibly alleged a violation of the AKS and, therefore, had failed to allege protected activity under the FCA).

#### d) Plaintiff's Audit Finding Did Not Relate To Referrals Or The Stark Law.

The Stark Law "limits efforts by healthcare providers to profit from the overutilization of medical services paid for by Medicare." *Kyer*, 178 F.4th at 130. "It prohibits any physician who has a 'financial relationship' with a hospital (or other entity) from making a 'referral' to that hospital for the furnishing of 'designated health services' paid by Medicare." *Id.* (citing 42 U.S.C. § 1395nn(a)(1). "If the physician makes a prohibited referral, the hospital may not bill Medicare for those referred services." *Id.*

The elements of a Stark Law violation are "(1) a physician (2) with a prohibited financial relationship with the hospitals (3) made a referral (4) for a designated health service [as that term is defined in the Stark Law], and (5) that a hospital then submitted a claim to Medicare for that service." *Id.* Plaintiff's Complaint does not allege facts to demonstrate these elements or to otherwise establish that she had an objectively reasonable belief that any violation of the Stark Law was occurring and would lead to a violation of the FCA. The Complaint simply makes the vague and conclusory allegation that "[c]laims arising from referrals prohibited by the Stark Law are . . . not properly payable by federal healthcare programs." (Compl. ¶ 23.) However, the Complaint does not identify any referrals, who made the referrals, what type of services were provided, and how the services were billed. In short, there are absolutely no facts alleged to demonstrate that any TidalHealth physicians with a financial relationship to TidalHealth referred "designated health services" to TidalHealth and that TidalHealth billed Medicare for those services. Indeed, the Fourth Circuit recently confirmed that ordinary physician compensation and alignment practices – including productivity-based compensation – do not support Stark Law or AKS liability absent particularized facts establishing each statutory element, and that "inflammatory" and conclusory characterizations of common healthcare business practices are not

enough. *Kyer*, 178 F.4th at 130-38. And, although the Complaint alleges that Vice President of Finance Jim Kanuck commented that there appeared to be "Stark issues," that does not mean that there were violations of the Stark Law, and it does not remedy the fact that the Complaint does not allege any facts that could plausibly establish a violation of the Stark Law or demonstrate that Plaintiff had an objectively reasonable belief that TidalHealth was violating the Stark Law and, therefore, in turn would be violating the FCA.

In summary, the Complaint does not allege facts to plausibly establish violations of the AKS or the Stark Law. In turn, Plaintiff cannot rely on such alleged violations to establish the protected activity element of her FCA retaliation claim.

**e) Plaintiff Conducted The Audits, And Reported Her Findings To TidalHealth, As Part Of Her Audit And Compliance Role As Opposed To Because She Had A Belief That TidalHealth Was Violating The FCA.**

As discussed above, under the objective reasonableness standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Grant*, 912 F.3d at 201. "A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.*

Plaintiff's Complaint makes it clear that Plaintiff conducted the audits, and reported her findings to TidalHealth, ***because that was what TidalHealth had hired her to do***. The Complaint explicitly states that Plaintiff was hired as Senior Director of Practice Operations, which is "an ***auditing and compliance role***;" that she conducted the audit of provider schedules and provider time off "***as part of her role***;" that "***in the ordinary course of her auditing and compliance duties***," she identified the issues that she reported to TidalHealth; and that by identifying and

reporting the issues, she "***performed precisely the work for which she was retained***." (Compl. ¶¶ 2, 12, 14, 19, 24, 29.) Therefore, as the Complaint makes clear, Plaintiff reported her findings internally because that was her job, rather than because she had a belief that TidalHealth was violating the FCA or because she was trying to stop violations of the FCA. This further demonstrates Plaintiff's inability to establish the first element of an FCA retaliation claim.

**2. The Complaint Does Not Allege Facts To Plausibly Satisfy The Second Element Of An FCA Claim — There Are Insufficient Allegations That TidalHealth Viewed Plaintiff As A Whistleblower.**

The second element of an FCA retaliation claim is that the employer "knew about the protected activity." *LeVerette v. Louis Berger United States, Inc.*, No. 22-1891, 2024 U.S. App. LEXIS 12419, at *2 (4th Cir. May 23, 2024). There are absolutely no facts alleged to establish that TidalHealth was aware that Plaintiff was acting as a whistleblower and engaging in efforts to stop violations of the FCA. That deficiency is especially significant here, where Plaintiff pleads that auditing and compliance reporting was the very work she was hired to perform: an employer cannot be placed on notice of protected activity by receiving precisely the reports it engaged the employee to generate, absent allegations that the employee communicated concerns about fraud on the federal government as distinct from operational or regulatory concerns. Rather, as discussed above, Plaintiff conducted the audit, and reported her findings internally, because that is what TidalHealth had hired her to do. The Complaint does not allege that Plaintiff's internal reports put TidalHealth on notice that she was reporting potential fraud in violation of the FCA, as opposed to reporting general operational concerns.

For these reasons, Plaintiff's Complaint fails to state an FCA retaliation claim upon which relief can be granted and Count I should be dismissed.

**B. Count II – Plaintiff's Complaint Fails To State A Fair Credit Reporting Act Claim Upon Which Relief Can Be Granted.**

Count II purports to assert a violation of the Fair Credit Reporting Act ("FCRA"). Specifically, relying solely on the TCPalm article regarding Plaintiff's 2012 arrest, the Complaint alleges that Tidal Health (1) procured a "consumer report" regarding Plaintiff without a permissible purpose and in excess of the scope of any authorization Plaintiff had provided, in violation of 15 U.S.C. § 1681b; (2) used the "consumer report" to take adverse action against her without providing her a copy of the report and a written description of her rights under the FCRA, in violation of 15 U.S.C. §§ 1681b(b)(3) and 1681m(a); and (3) failed to provide Plaintiff the post-adverse-action notice required by 15 U.S.C. § 1681m(a). (Compl. ¶¶ 73-75.) As discussed below, Plaintiff's Complaint fails to state a FCRA claim upon which relief can be granted because it fails to plausibly allege that Tidal Health obtained a "consumer report" from a "consumer reporting agency."

**1. <u>The FCRA Only Governs The Procurement Of "Consumer Reports."</u>**

The FCRA provisions referenced in the Complaint are only triggered by the employer's use or procurement of a "consumer report." Specifically:

- Section 1681b(b)(2)(A) of the FCRA provides that "a person may not procure a ***<u>consumer report</u>***, or cause a ***<u>consumer report</u>*** to be procured, for employment purposes with respect to any consumer, unless – (ii) the consumer has authorized in writing . . . the procurement of the report by that person. 15 U.S.C. § 1681b(b)(2)(A)(ii) (emphasis added).
- Section 1681b(b)(3) provides that "in using a ***<u>consumer report</u>*** for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to

whom the report relates – (i) a copy of the report; and (ii) a description in writing of the rights of the consumer under this title . . ." 15 U.S.C. § 1681b(b)(3)(A) (emphasis added).

- Section 1681(m)(a) requires that "[i]f any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a ***consumer report***," the person shall provide certain notices to the consumer. 15 U.S.C. § 1681m(a) (emphasis added).

The term "consumer report" is defined by the FCRA as "any written, oral, or other communication of any information by a ***consumer reporting agency*** bearing on a consumer's credit worthiness [creditworthiness], credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for – (B) employment purposes." 15 U.S.C. § 1681a(d)(1) (emphasis added). Thus, a communication is not a "consumer report" unless it originates from an entity that meets the statutory definition of a "consumer reporting agency."

The FCRA defines a "consumer reporting agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

As discussed below, the Complaint fails to plausibly allege that TidalHealth obtained a "consumer report" from a "consumer reporting agency."

### 2. The Complaint Makes Only Conclusory, Speculative Allegations Regarding a "John Doe Reporting Agency," And <u>Any Claim Based On An Unidentified, "John Doe" Agency Fails.</u>

The Complaint names "John Doe Consumer Reporting Agency" as a defendant but concedes that its "identity is presently unknown to Plaintiff." (Compl. ¶ 7.) The Complaint then simply speculates that "TidalHealth caused a second background investigation of [Plaintiff] to be conducted by John Doe CRA." (Compl. ¶¶ 7, 49.) The Complaint, however, does not identify any specific consumer reporting agency, does not allege that TidalHealth entered into any contract or business relationship with a consumer reporting agency to conduct a second background check, and does not identify any second background criminal report provided to TidalHealth. Such conclusory allegations that an unidentified John Doe entity acted as a consumer reporting agency are insufficient to contain "enough facts to state a claim to relief that is plausible on its face" as is required under the *Twombly* and *Iqbal* pleading standard.

### 3. Plaintiff's Alternative Theory Also Fails Because Internet Searches By TidalHealth Employees Do Not Constitute <u>Consumer Reports And Are Not Governed By The FCRA.</u>

Recognizing that the above theory is deficient, the Complaint alleges an alternative theory. Specifically, the Complaint states:

> In the alternative, and upon information and belief, to the extent TidalHealth contends that no consumer reporting agency was involved and that the expunged matter was located through internet searches conducted by TidalHealth personnel or agents, such searches were conducted using one or more third-party websites, data brokers, people-search services, or information aggregators that assemble or evaluate information on consumers for the purpose of furnishing it to third parties, and that accordingly, constitute consumer reporting agencies within the meaning of 15 U.S.C. § 1681a(f).

(Compl. ¶ 52.)

Plaintiff's alternative theory fails. The Complaint describes an internet search conducted by TidalHealth personnel that resulted in locating a public news article. (Compl. ¶ 42; Exhibit 1.) The Complaint does not allege any facts that in any way suggest that any "consumer reporting agency" was somehow involved in that internet search. Rather, the Complaint asks this Court to simply assume that the internet search involved a "consumer reporting agency." This Court has previously rejected such an assumption. Specifically, in *Bing v. Brivo Sys., LLC*, 2019 U.S. Dist. LEXIS 9960, at *2-3, 10-12 (D. Md. Jan. 22, 2019), the plaintiff's employment with Brivo was terminated after another employee "googled" plaintiff and located a Baltimore Sun article that referenced the plaintiff as having given his roommate a loaded gun, which ultimately was used in celebratory gunfire and injured someone. *Id.* at *2-3. The plaintiff filed a lawsuit, claiming that Brivo violated the FCRA by relying on a Google search as the basis for his termination and not complying with the FCRA's requirements. This Court dismissed the plaintiff's FCRA claim because nowhere had the plaintiff alleged that Brivo was a "consumer reporting agency" as defined by statute and because "the Google search that [Brivo's employee] performed on [plaintiff]'s first day of work cannot as a matter of law constitute a 'consumer report' under the FCRA, if for no other reason than it was not generated by a 'consumer agency.'" *Id.* at *10-12. *See also Sandofsky v. Google LLC*, 2021 U.S. Dist. LEXIS 130393, at *5-10 (D. Mass. July 13, 2021) (dismissing FCRA claim based on Google search because the complaint did not contain sufficient allegations that Google is a consumer reporting agency, because conclusory allegations that Google returns search results on consumers is not sufficient, and because the complaint does not contain information that Google regularly engages "in the practice of assembling or evaluating consumer credit information"), *aff'd*, 2023 U.S. App. LEXIS 35528 (1st Cir. Sept. 6, 2023).

Under Plaintiff's theory, every internet resource would constitute a "consumer reporting agency." Such an interpretation is inconsistent with the statutory definition of a "consumer reporting agency," which requires that the entity "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). A general-purpose search engine, or a publicly available news article or website, such as TCPalm, located through internet browsing does not meet that definition, and there are absolutely no facts alleged in the Complaint to suggest otherwise. Moreover, accepting Plaintiff's theory would mean that every internet search conducted by anyone could potentially fall within the scope of the FCRA. Nothing in the text or purpose of the FCRA supports such a sweeping result.

For these reasons, the Complaint fails to state an FCRA claim upon which relief can be granted and Count II should be dismissed.

### C. Count IV – Plaintiff's Complaint Fails To State A Claim For Wrongful Discharge In Violation of Maryland Public Policy.

In Count IV, Plaintiff purports to plead, in the alternative, a common law wrongful discharge claim based upon the alleged "public policy" in Section 10-109 of the Criminal Procedure Article of the Code of Maryland, which prohibits specific acts with respect to expunged police and court records. Specifically, the Complaint alleges that the TCPalm news article referenced Plaintiff's "judicially expunged record," and that terminating Plaintiff based on that "judicially expunged record" constitutes a wrongful discharge in violation of public policy. For the reasons discussed below, the Complaint fails to state a wrongful discharge claim upon which relief can be granted.

### 1. <u>Wrongful Discharge Is A Narrow Exception To At-Will Employment.</u>

It is well established under Maryland law that "at-will employment can be legally terminated at the pleasure of either party at any time." *Makovi v. Sherwin-Williams*, Co., 316 Md. 603, 609 (1989) (citation and internal quotation marks omitted). Maryland has recognized a limited exception to the employent at will rule and permitted a cause of action for wrongful discharge where the termination of the plaintiff's employment contravenes some "clear mandate of public policy." *Adler v. American Standard Corp.*, 291 Md. 31, 43 (1981). This common law tort constitutes a "narrow exception" to the principle of at-will employment. *King v. Marriott Int'l, Inc.*, 160 Md. App. 689, 699 (2005). Because the exception is narrowly construed, a wrongful discharge claim should be recognized "if at all, only with the utmost circumspection." *Thompson v. Mem'l Hosp.*, 925 F. Supp. 400, 405 (D. Md. 1996) (quoting *Adler*, 291 Md. at 46).

To state a claim for wrongful discharge, a plaintiff must show that: (1) she was discharged; (2) the basis for her discharge violated a specific, clear mandate of public policy; and (3) there is a nexus between her conduct and the employer's decision to fire the employee. *See Verbal v. Giant of Md., LLC*, 204 F. Supp. 3d 837, 842-43 (D. Md. 2016) (citing Wholey *v. Sears Roebuck*, 370 Md. 38, 50-51 (2002)).

With respect to the second element, in order for a mandate of public policy to be sufficiently well-established to form the basis of a wrongful discharge action, there "must be a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation." *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 151 (4th Cir. 2002) (quoting *Porterfield v. Mascari II, Inc.*, 142 Md. App. 134, 788 A.2d 242, 245 (2002))*; see also King*, 160 Md. App. at 701-02. Moreover, a plaintiff *must* "specifically identify" the clear mandate of public policy she alleges was violated.

*Terry v. Legato Sys., Inc.*, 241 F. Supp. 2d 566, 569 (D. Md. 2003) (quoting *Szaller*, 293 F.3d at 151).

### 2. The Complaint Does Not Allege Sufficient Facts To Establish That § 10-109 Contains A Broad Pronouncement Of Public Policy Or That It Even Applies To The Facts Alleged By Plaintiff.

The Complaint bases Plaintiff's wrongful discharge claim upon the alleged "public policy" in § 10-109 of the Criminal Procedure Article of the Code of Maryland. Section 10-109 states:

> (a)
>
> (1) Disclosure of expunged information about criminal charges in an application, interview, or other means may not be required:
>
> (i) by an employer or educational institution of a person who applies for employment or admission; or
>
> (ii) by a unit, official, or employee of the State or a political subdivision of the State of a person who applies for a license, permit, registration, or governmental service.
>
> (2) A person need not refer to or give information concerning an expunged charge when answering a question concerning:
>
> (i) a criminal charge that did not result in a conviction; or
>
> (ii) a conviction that the Governor pardoned.
>
> (3) Refusal by a person to disclose information about criminal charges that have been expunged may not be the sole reason for:
>
> (i) an employer to discharge or refuse to hire the person; or
>
> (ii) a unit, official, or employee of the State or a political subdivision of the State to deny the person's application.
>
> (b)
>
> (1) A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year or both for each violation.

> (2) In addition to the penalties provided in paragraph (1) of this subsection, an official or employee of the State or a political subdivision of the State who is convicted under this section may be removed or dismissed from public service.

Md. Code, Crim. Proc. Art., § 10-109.

The Complaint alleges that "Maryland has a clear mandate of public policy, reflected in statute and judicial decision, including MD Code Ann., Crim. Proc. § 10-109 (LexisNexis 2018), that judicially expunged records be treated as legally nonexistent and not be used as the basis for adverse action against an individual." (Compl. ¶ 86.) The Complaint further alleges that the "use of an expunged record to terminate employment contravenes this clear mandate of public policy," and that TidalHealth terminated Plaintiff "in violation of this clear mandate of public policy by terminating her on the basis of a judicially expunged record." (Compl. ¶¶ 86-87.)

Section 10-109, however, does not contain the broad pronouncement of public policy that the Complaint alleges it does. Rather, it prohibits very specific conduct, none of which is alleged to have occurred here.

**a) Section 10-109 Prohibits Certain Conduct With Respect To *Police Or Court Records* Expunged *Under Maryland Law*.**

Section 10-109 is located in Title 10, Subtitle 1 of the Criminal Procedure Article of the Maryland Code, and it must be read in the context of that Subtitle. That Subtitle (§§ 10-101 – 10-112) is called, "Expungement of Police and Court Records." Section 10-101 defines "expunge" as "to remove information from public inspection ***in accordance with this subtitle***," and Section 10-102 states that "[a] police record or a court record is subject to expungement ***under this subtitle***." Md. Code, Crim. Proc. Art., §§ 10-101, 10-102. Subtitle 1 then contains various provisions discussing the circumstances under which a criminal charge can be expunged under Maryland law. *See* Md. Code Ann., Crim. Proc. Art., §§ 10-103 – 10-107. Thus, the expunged

records referenced in § 10-109 concern ***police and court records*** that were expunged in accordance with ***Maryland law***.

The Complaint, however, does not allege that TidalHealth obtained a police or court record. Rather, it alleges only that Cindy Lunsford, TidalHealth's Executive Vice President/Chief Operations Officer and President, referenced a public internet news article that is still available to the public at https://archive.tcpalm.com/news/vero-beach-woman-former-stuart-ceo-facing-fraud-and-theft-charges-ep-381976382-342995152.html/.

Furthermore, the Complaint does not allege that Plaintiff's criminal charges were ever expunged, or could even be eligible to be expunged, ***under Maryland law***. Rather, the Complaint alleges that on March 23, 2026, Ms. Lunsford "opened a file that contained an outdated and obscure TCPalm news article referencing [Plaintiff's] expunged record. [Plaintiff] was then grilled by Cindy Lunsford about the contents of the article to which [Plaintiff] profusely iterated, "You did a background check on me. I passed my background check." (Compl. ¶ 42.) The Complaint further alleges that on March 27, 2026, Ms. Lunsford "again questioned [Plaintiff] about her criminal history" and that "Ms. Green again reiterated, "You did a background check on me. I passed my background check." (Compl. ¶ 44.)

As stated in the Complaint, in the Fall of 2025, Plaintiff relocated from Florida to Delaware in order to take the job at TidalHealth, and she commuted from her Delaware home to TidalHealth's Salisbury, Maryland facility. (Compl. ¶¶ 14-15, 17.) The TCPalm news article referenced in the Complaint is a September 2012 article, on the www.tcpalm.com website, titled, "Vero Beach woman, former Stuart CEO, facing fraud and theft charges." (Exhibit 1.) Thus, ***the article is from a news site in Florida regarding criminal charges that were made against Ms. Green while she was living in Florida***. As the article explains, in September 2012, "[a]

***Florida*** Division of Insurance Fraud detective . . . charged Suzanne Green . . . with insurance fraud and grand theft after she received more than $5,000 from the supplemental insurance carrier Aflac for six fraudulent claims, according to a report from the ***Florida*** Department of Financial Services – Fraud Division." (*See* Exhibit 1 (emphasis added).)

The Complaint, therefore, alleges that Ms. Lunsford asked Plaintiff about a public internet news article concerning charges that were brought against Plaintiff ***in Florida***. The charges were not brought against Plaintiff in Maryland, and the Complaint does not allege any facts that plausibly suggest that the charges against Plaintiff were expunged, or eligible to be expunged, under any of the provisions of Title 10, Subtitle 1 of the Criminal Procedure Article of the Maryland Code.

Furthermore, the Complaint only includes the vague and conclusory allegation that Plaintiff's records were "judicially expunged." The Complaint alleges absolutely no facts to support that conclusory allegation, such as what records were expunged, when those records were expunged, or the court that supposedly expunged them, let alone that they were expunged under Maryland law.

**b) The Complaint Does Not Allege Facts To Establish That TidalHealth Otherwise Engaged In Any Of The Conduct Prohibited By § 10-109.**

Moreover, absolutely nothing in § 10-109(a) prohibits the conduct alleged in the Complaint.

Section 10-109(a)(1) states that "[d]isclosure of expunged information about criminal charges in an application, interview, or other means may not be required by an employer or educational institution of a person who applies for employment or admission." Here, Plaintiff was not applying for employment when Ms. Lunsford mentioned the article. Rather, as stated in the Complaint, the conversation with Ms. Lunsford occurred in March 2026, several months after

Plaintiff commenced employment with TidalHealth in December 2025. (Compl. ¶¶ 17, 41-44.) There is, therefore, absolutely no allegation that Ms. Lunsford or TidalHealth required Plaintiff to disclose any expunged information about criminal charges during the application process.

Section 10-109(a)(2) states that "[a] person need not refer to or give information concerning an expunged charge when answering a question concerning (i) a criminal charge that did not result in a conviction; or (ii) a conviction that the Governor pardoned." There is no allegation in the Complaint that Plaintiff's theft and fraud charges either did not result in a conviction or resulted in a conviction that the Governor pardoned. To the contrary, a public website, mugshots.com, reflects that Plaintiff was sentenced on July 18, 2013, for theft and fraud charges and placed on felony probation. (*See* Exhibit 2, which is also available at https://mugshots.com/US-States/Florida/Martin-County-FL/Suzanne-Green.69204715.html.) Thus, a public website that was available to TidalHealth reflects that she was sentenced and, therefore, convicted of the charges.

Section 10-109(a)(3) states that "[r]efusal by a person to disclose information about criminal charges that have been expunged may not be the sole reason for . . . an employer to discharge or refuse to hire the person." The Complaint does not allege that Plaintiff was terminated for refusing to disclose information about her theft and fraud charges. Rather, the Complaint alleges that TidalHealth terminated her employment based on the contents of the article, not based on her failure to disclose information about the charges. (*See* Compl. ¶ 87, alleging that Plaintiff was terminated "on the basis of a judicially expunged record.")

According to the Complaint's own factual allegations, TidalHealth obtained information regarding Plaintiff's criminal charges not from a formal criminal record but from a publicly available news article. (Compl. ¶ 42, stating that Ms. Lunsford "opened a file that contained an

outdated and obscure TCPalm news article referencing Ms. Green's [criminal charges].") There is absolutely nothing in § 10-109 that prohibits an employer's use of publicly available news articles to guide employment decisions.

### c) Maryland Public Policy Simply Does Not Prohibit Reliance On News Articles About Past Criminal Convictions.

In summary, the Complaint simply makes the vague allegation that Maryland public policy requires "that judicially expunged records be treated as legally nonexistent and not be used as the basis for adverse action against an individual." (Compl. ¶ 86.) Nowhere, however, does § 10-109 contain any such clear mandate of public policy.

Maryland courts have repeatedly acknowledged that a public policy mandate must be specific and clear; "[i]t is generally not sufficient to show that the employer violated the 'spirit' or 'intent' underlying a particular law." *McIntyre v. Guild, Inc.*, 105 Md. App. 332, 344 (1995). Rather, a plaintiff must "set forth clear, specific allegations of fact tending to show the employer either (1) violated the legal rule at issue, or (2) punished the employee for exercising some legal right." *Id.* As demonstrated above, the Complaint does not set forth any facts, much less any clear, specific allegations of fact, tending to show that TidalHealth violated § 10-109. This Court should not, therefore, declare a violation of public policy where one simply does not exist.

For the above reasons, Plaintiff's wrongful discharge claim should be dismissed for failure to state a claim upon which relief can be granted.

## V. CONCLUSION

Wherefore, for the foregoing reasons, TidalHealth respectfully requests that this Court grant its Motion and enter an order dismissing Counts I, II, and IV of the Complaint, the only counts asserted against TidalHealth, with prejudice.

Dated: September 25, 2026

Respectfully submitted,

/s/

Larry R. Seegull (Bar No. 22991)
Jill S. Distler (Bar No. 26166)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
(410) 415-2000 – Telephone
(410) 415-2001 – Facsimile
Larry.Seegull@jacksonlewis.com
Jill.Distler@jacksonlewis.com

*Counsel for Defendant TidalHealth Peninsula Regional, Inc., d/b/a McCready Pavilion*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, Defendant TidalHealth Peninsula Regional, Inc.'s Memorandum in Support of Motion to Dismiss Plaintiff's Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/
Jill S. Distler

4909-4417-6847, v. 3