# EXHIBIT A

## PLAINTIFF'S PROPOSED FIRST AMENDED COMPLAINT

**(CLEAN COPY)**

*Suzanne Green v. TidalHealth Peninsula Regional, Inc., et al.*

Civil Action No. 1:26-cv-02916-JKB (D. Md.)

Original of the proposed amended document, submitted with
Plaintiff's Motion for Leave to File a First Amended Complaint

Local Rule 103.6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**(Northern Division)**

**SUZANNE GREEN,**

c/o Masood Law
100 Commerce Drive, Suite 304
Newark, DE 19713
(302) 722-5441
zuneera@masoodlaw.com

Plaintiff,

v.

**TIDALHEALTH PENINSULA REGIONAL, its affiliates, subsidiaries, and other related entities, under any name by which they are known,**

100 East Carroll Street
Salisbury, Maryland 21801
(Wicomico County)
c/o Jackson Lewis P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, MD 21209
(410) 415-2004
Larry.Seegull@jacksonlewis.com

Defendant.

Civil Action No. 1:26-cv-02916-JKB

**JURY TRIAL DEMANDED**

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff Suzanne Green, by and through her undersigned counsel, and brings this First Amended Complaint against Defendant TidalHealth Peninsula Regional, and in support thereof alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action for unlawful retaliation in violation of the False Claims Act, violation of the Fair Credit Reporting Act, and wrongful discharge arising from Defendant TidalHealth Peninsula Regional's termination of Plaintiff Suzanne Green in retaliation for

her protected disclosures of financial and operational improprieties, and from TidalHealth's procurement of a consumer report on Plaintiff after it had already terminated her.

2. Plaintiff is an accomplished compliance and auditing professional who left a substantially higher-paying position, sold her home, and relocated her household - including her husband, a disabled United States military veteran - to accept employment with TidalHealth. Within months of her hire, Plaintiff performed precisely the work for which she was retained: she identified and internally reported significant financial improprieties and operational deficiencies within TidalHealth's organization.

3. Rather than address Plaintiff's disclosures, TidalHealth retaliated. Its Chief Administrative Officer directed her to stop looking into the matters she had raised. Days later, TidalHealth twice confronted her about a Florida matter whose records a Florida court had sealed years earlier, and it terminated her on March 27, 2026, the same day she declined for the second time to discuss it, citing only "operational issues." On the next business day, TidalHealth began obtaining a new consumer report on Plaintiff, although she was no longer its employee and TidalHealth had no permissible purpose to obtain it.

4. Plaintiff asserts claims under the False Claims Act, 31 U.S.C. § 3730(h) (2018); the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (2018); and Maryland common law. She seeks compensatory damages, punitive damages, statutory damages, equitable relief, and attorneys' fees and costs.

## II. THE PARTIES

5. Plaintiff Suzanne Green is an adult individual and a resident of Millsboro, Sussex County, Delaware. At all times relevant to this Complaint, Plaintiff was employed by TidalHealth

and performed her job duties at TidalHealth's facility in Salisbury, Maryland, commuting daily from her residence in Delaware to Maryland.

6. Defendant TidalHealth Peninsula Regional ("TidalHealth") is a healthcare organization organized under the laws of the State of Maryland, with its principal place of business located in Salisbury, Wicomico County, Maryland. At all relevant times, TidalHealth was Plaintiff's employer and was a "user" of consumer reports within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681b (2018).

## III. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the False Claims Act, 31 U.S.C. § 3730(h), and the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. See also 15 U.S.C. § 1681p.

8. This Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a) because that claim is so related to the federal claims that it forms part of the same case or controversy under Article III of the United States Constitution.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (2018) because Defendant TidalHealth resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including at TidalHealth's Salisbury, Maryland facility where Plaintiff was employed and from which she was terminated.

10. Assignment to the Northern Division is proper under Local Rule 501 because TidalHealth's principal place of business is located in Wicomico County, Maryland, which lies within the Northern Division pursuant to 28 U.S.C. § 100 (2018).

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Recruitment and the Sacrifices She Made to Join TidalHealth

11. Plaintiff is a highly credentialed compliance and auditing professional with extensive experience in healthcare regulatory environments. She was employed by TidalHealth as its Senior Director of Operations, where she was responsible for ensuring regulatory compliance including compliance with the Health Insurance Portability and Accountability Act ("HIPAA").

12. In the calendar year immediately preceding her employment with TidalHealth, Plaintiff earned wages of approximately $272,000 from her prior employer, reflecting her professional standing and market value.

13. In or around the Fall of 2025, TidalHealth recruited Plaintiff to serve in an auditing and compliance role at its Salisbury, Maryland facility. Plaintiff accepted TidalHealth's written offer of employment, which provided for an annual base salary of $165,000; a variable compensation plan equal to fifteen percent (15%) of base salary, payable after the close of the fiscal year, and eligibility to participate in TidalHealth's 403(b) and 457(b) retirement plans.

14. In reliance on TidalHealth's offer and her reasonable expectation of continued employment, Plaintiff made substantial, irreversible personal and financial commitments. She and her husband - a disabled United States military veteran for whom Plaintiff is the sole financial provider - listed and ultimately sold their primary residence in Florida and relocated to Millsboro, Delaware.

15. Because TidalHealth required Plaintiff to begin work on December 1, 2025, before her Florida residence had sold, Plaintiff was compelled to carry the costs of both her Florida mortgage and her new Delaware residence simultaneously for approximately three and one-half months, until the Florida home sold on or about March 19, 2026. Plaintiff incurred

substantial relocation expenses and real estate transaction costs as a direct consequence of accepting employment with TidalHealth.

16. Plaintiff commenced employment with TidalHealth on December 1, 2025, and reported to and performed her duties at TidalHealth's Salisbury, Maryland facility, commuting daily from her Delaware residence.

17. Prior to Plaintiff's hire, TidalHealth conducted a pre-employment background investigation of Plaintiff consistent with its standard screening policy, which provides for a ten-year lookback period. That investigation returned results satisfactory to TidalHealth, and TidalHealth hired Ms. Green.

**B. The Sealed Matter and TidalHealth's Pre-Employment Consumer Report**

18. Plaintiff was the subject of a Florida criminal matter in which she was not adjudicated guilty (the "Sealed Matter"). On September 9, 2016, the Circuit Court of the Nineteenth Judicial Circuit of Florida entered an "Order to Seal Records" directing that the records of the Sealed Matter be sealed (the "Sealing Order"). The Sealing Order found that Plaintiff "was not adjudicated guilty."

19. On September 15, 2025, as part of TidalHealth's hiring process, Plaintiff signed a form titled "Background Check Consent" through TidalHealth's applicant-tracking system for requisition number 33962 (the "September 15, 2025 Form"). The form combined a disclosure and an authorization to obtain consumer reports.

20. TidalHealth then ordered a consumer report on Plaintiff from PreCheck, Inc., a Cisive company ("PreCheck").

21. PreCheck is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). For monetary fees, PreCheck regularly assembles and evaluates information on consumers, including criminal-record, sanctions, and employment-history information, for the purpose

of furnishing consumer reports to third parties, including employers, and it uses means and facilities of interstate commerce to prepare and furnish such reports.

22. On November 26, 2025, PreCheck delivered to TidalHealth a consumer report on Plaintiff, Report No. 9182803 (the “Pre-Employment Report”). PreCheck prepared the report for TidalHealth under PreCheck client identification number 18253, to the attention of TidalHealth’s Ann Garman “an Onboarding Coordinator”. The report identified the position Plaintiff applied for as “Director.”

23. The Pre-Employment Report included criminal-record searches designated "National," "Sex Offender, US," "Sussex, DE," "Martin, FL," "Palm Beach, FL," and "Statewide, MD." Every search returned "CLEAR."

24. One of those searches covered the Florida county in which the Sealed Matter arose and in which the Sealing Order was entered.

25. Before Plaintiff’s first day of work, TidalHealth therefore had in hand its own consumer reporting agency’s report that a search of the county where the Sealed Matter arose disclosed no criminal record.

26. The Pre-Employment Report verified Plaintiff’s most recent employer. It did not verify any earlier employment.

**C. Plaintiff’s Protected Disclosures**

27. Shortly after commencing employment, Plaintiff, in the ordinary course of her auditing and compliance duties, identified and documented significant financial improprieties and related operational deficiencies within TidalHealth’s organization.

28. Plaintiff reasonably believed that the conduct she identified evidenced violations of law and regulation governing TidalHealth’s operations, including federal healthcare and financial compliance requirements.

29. Plaintiff fulfilled her professional and legal obligations by internally reporting her findings to supervisory and executive personnel within TidalHealth who possessed authority to investigate and act upon such disclosures.

30. The financial improprieties and operational deficiencies Plaintiff identified included arrangements and practices that she reasonably believed violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (2018), and the federal physician self-referral law (the "Stark Law"), 42 U.S.C. § 1395nn (2018), including physician compensation arrangements within the Neurology and Neurosurgery service lines that Plaintiff questioned as potentially exceeding fair market value, and the retention of highly compensated physicians whom Plaintiff questioned as being retained for reasons other than the clinical services actually provided, including to maintain the hospital's trauma center designation.

31. TidalHealth submits claims for payment to federally funded healthcare programs, including Medicare and Medicaid. Claims for items or services resulting from a violation of the Anti-Kickback Statute constitute false or fraudulent claims for purposes of the False Claims Act, 31 U.S.C. §§ 3729-3733 (2018); see 42 U.S.C. § 1320a-7b(g) (2018). Claims arising from referrals prohibited by the Stark Law are likewise not properly payable by federal healthcare programs.

32. Plaintiff, as part of her role, conducted an audit of provider schedules and compared actual patient care hours to contractual expectations.

33. The standard office hours were 8:00 a.m. to 5:00 p.m. Under TidalHealth's scheduling practice, providers were expected to see patients from approximately 8:00 a.m. to 12:00 p.m. and 1:00 p.m. to 4:30 p.m., with administrative time built into their schedules.

34. Provider contracts generally required either a 36/4 model or a 34/6 model, meaning providers were expected to perform 34-36 hours of face-to-face patient care each week with four to six (4-6) hours of administrative time.

35. Plaintiff's audit revealed that approximately eighty-five to ninety percent (85-90%) of providers were only working twenty-four (24) to twenty-eight (28) patient care hours per week, significantly below their contractual obligations.

36. Furthermore, and in many cases, providers blocked their schedules so that patient appointments did not begin until 9:00 a.m. and ended as early as 3:30 p.m., substantially reducing patient access and organizational revenue.

37. Plaintiff, in her official capacity, also initiated an audit of provider time off beginning in 2025.

38. Plaintiff's audit revealed that providers were taking half-days, full days, and even extended periods away from work without properly recording their leave in the payroll system. As a result, paid time off was not deducted from their PTO banks while they continued receiving their regular compensation.

39. Additionally, at the end of 2025, providers and employees who were absent from work received additional PTO payouts in situations where leave had not been properly recorded.

40. These findings also included members of management, many of whom expressed dissatisfaction that their time records were being reviewed and audited.

41. As if that wasn't enough, Plaintiff's audit also revealed that certain neurologists and neurosurgeons were earning compensation in excess of eight hundred and fifty thousand dollars ($850,000) annually while averaging approximately fifteen (15) hours of patient care per week.

42. Upon information and belief, the neurologists and neurosurgeons whose compensation Plaintiff questioned referred patients to TidalHealth for designated health services within the meaning of the Stark Law, including inpatient and outpatient hospital services and imaging, for which TidalHealth submitted claims to Medicare.

43. When these concerns were reported, Plaintiff was informed that leadership wanted to preserve the service line despite the financial impact. During discussions regarding these findings, Vice President of Finance Jim Kanuck commented that there appeared to be "Stark issues" associated with the arrangement. Although Mr. Kanuck is publicly identified as TidalHealth's Vice President of Finance, at the relevant time he was serving as Vice President of Finance for TidalHealth Medical Partners, tasked with "righting the ship." After joining TidalHealth from Atlantic General following the early March 2026 merger, he was responsible for reviewing Medical Partners' revenue, expenses, provider contracts, and productivity.

44. Plaintiff reasonably believed that the arrangements and practices she identified had resulted in, or would result in, the submission of false or fraudulent claims to federal healthcare programs, fraudulently maintaining the hospital's trauma center designation, and she undertook efforts to stop those violations, including by investigating, documenting, and internally reporting them.

45. On or about February 2026, Plaintiff reported her findings and concerns to members of TidalHealth's directors and executive leadership, including Tres Pelot, Cindy Lunsford, Joel Bullock, Jennifer Ketterman, Paul Sonder and others. Plaintiff further advised leadership that TidalHealth's Human Resources function should be involved in addressing the matters she had identified.

46. Rather than investigate or address Plaintiff's disclosures, on or about March 12, 2026, Tres Pelot, TidalHealth's Chief Administrative Officer, explicitly directed Plaintiff to stop looking into the matters she had raised.

47. On Friday, March 20, 2026, Plaintiff attended a 9:00 a.m. leadership meeting that became extremely heated. Cindy Lunsford announced organizational changes that would cause Practice Directors to report to Plaintiff while Directors Joel Bullock, Jennifer Ketterman,

Paul Sonder would assume more strategic responsibilities. Directors Joel Bullock, Jennifer Ketterman, Paul Sonder strongly opposed these changes.

48. Plaintiff thereafter began receiving hostile and negative treatment from Directors Joel Bullock, Jennifer Ketterman, Paul Sonder at every turn.

49. As a result of the hostile treatment imposed on her, Plaintiff sent emails up until termination addressing these issues and concerns.

**D. TidalHealth Terminated Plaintiff on March 27, 2026, Citing "Operational Issues"**

50. On Monday, March 23, 2026, Tres Pelot told Plaintiff that Cindy Lunsford wanted to meet with both of them regarding a meeting agenda. They went together to Cindy Lunsford's office. No Human Resources representative was present.

51. Once they were seated, Ms. Lunsford opened a file that contained a printout of a years-old news article concerning the Sealed Matter. Ms. Lunsford then questioned Plaintiff about the article, and Plaintiff repeatedly responded, "You did a background check on me. I passed my background check."

52. Four days later, on Friday, March 27, 2026, Tres Pelot again told Plaintiff that Cindy Lunsford wanted to meet with them regarding an agenda. No Human Resources representative was present or referenced during the meeting.

53. In the meeting, Ms. Lunsford again questioned Plaintiff about the Sealed Matter. Plaintiff again declined to discuss it, responding, "You did a background check on me. I passed my background check."

54. Ms. Lunsford then terminated Plaintiff's employment and produced a severance agreement for her to sign that referenced "operational issues." After Plaintiff was let go, Tres Pelot stated to Plaintiff in the elevator, "For what it's worth, you did a great job, too good a job."

55. The severance documents TidalHealth gave Plaintiff on March 27, 2026, included a "Personalized Statement" identifying her "employment separation date" as March 27, 2026, and stating that her paid-time-off accruals ended with her "last day of work on March 27, 2026." The proposed "Agreement and General Release" described her separation as an "involuntary separation due to operational issues" and provided that she would "not seek any employment or reemployment with the Company . . . in any manner."

56. Plaintiff did not sign the proposed agreement and received no payment under it.

57. Within weeks of Plaintiff's disclosures, and fifteen days after the Chief Administrative Officer directed her to stop looking into the matters she had raised, Plaintiff was summoned to a meeting and confronted about the Sealed Matter. Four days after that, TidalHealth terminated her.

58. When TidalHealth terminated Plaintiff, it did not cite her employment history. Upon information and belief, the only consumer report TidalHealth had obtained on her at that time was the Pre-Employment Report.

59. Plaintiff's internal reports constituted protected activity under the False Claims Act, 31 U.S.C. § 3730(h) (2018).

**E. TidalHealth's Retaliation and Its Post-Termination Consumer Report**

60. Following Plaintiff's protected disclosures, TidalHealth's treatment of her changed materially and for the worse. Plaintiff was subjected to heightened and unwarranted scrutiny of her work and conduct.

61. Upon information and belief, after terminating Plaintiff, TidalHealth ordered a new consumer report on her from PreCheck under the same client account, No. 18253 (the "Post-Termination Report"). PreCheck's records show that its work on the Post-

Termination Report began at 6:54 a.m. on Monday, March 30, 2026, the next business day after TidalHealth terminated Ms. Green.

62. When TidalHealth ordered and obtained the Post-Termination Report, Plaintiff was no longer TidalHealth's employee and had not applied for any position with TidalHealth. TidalHealth's own proposed separation agreement would have barred her from ever seeking reemployment with it. The order left the "Applied For" field blank.

63. The Post-Termination Report covered employment history only. It included no criminal-record or public-record search. The employment information TidalHealth supplied for the Post-Termination Report included employers that the Pre-Employment Report had not verified, including employment that began more than ten years earlier, beyond the ten-year lookback period of TidalHealth's own screening policy.

64. On April 6, 2026, PreCheck delivered the Post-Termination Report, Report No. 9421192, to TidalHealth, to the attention of TidalHealth's Allison Hamilton [its] "Director of Talent Acquisition". The report labeled its employment-history results "ALERT: Records Found - Date Discrepancy."

65. The Post-Termination Report is a "consumer report" as defined in 15 U.S.C. § 1681a(d)(1). It is a written communication of information by a consumer reporting agency bearing on Plaintiff's character, general reputation, and personal characteristics, collected by PreCheck for the purpose of serving as a factor in establishing a consumer's eligibility for employment.

66. TidalHealth had no permissible purpose to obtain the Post-Termination Report. Plaintiff was neither an applicant nor an employee, so TidalHealth could not have been evaluating her "for employment, promotion, reassignment or retention as an employee." 15 U.S.C. § 1681a(h). No credit, insurance, licensing, or other transaction initiated by Plaintiff was

involved, no court order or subpoena required the report, and Plaintiff gave no written instruction authorizing it. See 15 U.S.C. § 1681b(a).

67. Plaintiff never authorized TidalHealth to obtain a consumer report on her after her employment ended. The September 15, 2025 Form told her that TidalHealth “may obtain information about you from a consumer reporting agency for employment purposes,” and that the authorization would allow TidalHealth to obtain reports “now and, if you are hired, throughout the course of your employment to the extent permitted by law.” The authorization she signed covered reports “at any time after receipt of this authorization and, if I am hired, throughout my employment.” By its terms, the form authorized reports for employment purposes, during her application and, once she was hired, through the end of her employment. It did not authorize a consumer report on a former employee.

68. Upon information and belief, TidalHealth obtained the Post-Termination Report to look for a reason, after the fact, to justify the termination it had already carried out and documented. That is not a purpose for which the FCRA permits a consumer report to be obtained.

69. Upon information and belief, to obtain the Post-Termination Report, TidalHealth certified to PreCheck that it sought the report for employment purposes. That certification was false, because TidalHealth had already terminated Ms. Green.

70. Plaintiff did not know of the Post-Termination Report and did not consent to it. She learned of it only on October 9th, 2026, when she obtained her consumer file from PreCheck.

71. By obtaining the Post-Termination Report, TidalHealth intruded into Plaintiff’s private affairs. It obtained a compilation of her employment history, verification records located through employment-verification databases keyed to her Social Security number, and her personal identifiers, her date of birth, the last four digits of her Social Security number, her

home address, and her prior names. It did so when Plaintiff had no relationship with TidalHealth, and without her knowledge or consent.

**F. TidalHealth's Violation Was Willful**

72. TidalHealth regularly procures consumer reports for employment purposes and maintains a standing client account with PreCheck.

73. TidalHealth ordered the Post-Termination Report knowing that it had already terminated Ms. Green.

74. Every report PreCheck furnished to TidalHealth on Plaintiff included the FCRA summary of consumer rights. That summary states that a consumer reporting agency “may provide information about you only to people with a valid need – usually to consider an application with a creditor, insurer, employer, landlord, or other business.”

75. TidalHealth’s violation was knowing or, at a minimum, in reckless disregard of its obligations under the FCRA. It was therefore willful.

76. TidalHealth’s own separation documentation characterized Plaintiff’s termination as an “involuntary separation due to operational issues.” TidalHealth raised no concern about Plaintiff’s employment history before terminating her, and it has never identified the “operational issues” to which it referred . This characterization is irreconcilable with a termination premised on the Sealed Matter or on any concern about her background, and is evidence that the stated basis for the termination was pretextual.

77. The close temporal proximity between Plaintiff’s protected disclosures, the Chief Administrative Officer’s directive that she stop looking into the matters she had raised, TidalHealth’s confrontations about the Sealed Matter, her termination, and TidalHealth’s procurement of a new consumer report on her the next business day after terminating her

supports an inference that TidalHealth's true motivation was retaliation for Plaintiff's protected activity.

**G. The Sequence of Events**

78. TidalHealth terminated Plaintiff fifteen days after Tres Pelot, its Chief Administrative Officer, directed her, on March 12, 2026, to stop looking into the matters she had raised. It did so on the same day Plaintiff told TidalHealth, for the second time, that she had passed its background check.

79. Upon information and belief, TidalHealth did not investigate Plaintiff's employment history before terminating her. It had that history when it hired her and raised no concern about it before the termination. It began re-verifying her employment history on the next business day after it terminated her.

80. At termination, TidalHealth cited "operational issues," orally and in its written separation documents.

**H. The Consequences of TidalHealth's Conduct**

81. TidalHealth terminated Plaintiff's employer-sponsored health insurance coverage effective the date of her termination. Although TidalHealth subsequently provided notice of continuation coverage under COBRA, the cost of that coverage was prohibitive for Plaintiff, who had just lost her income.

82. Eleven days after her termination, on or about April 7, 2026, Plaintiff suffered a cardiac event. Plaintiff had no prior history of cardiac illness and no prior history of anxiety. Because TidalHealth had terminated her health coverage, she incurred upwards of $40,000 in medical expenses for the treatment of this cardiac event without the benefit of insurance coverage.

83. As a direct and proximate result of TidalHealth's conduct, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to lost wages and benefits; loss of future earning capacity; relocation and housing costs; uninsured and ongoing medical expenses; emotional distress, anxiety, and physical harm; and damage to her professional reputation.

## V. CLAIMS FOR RELIEF

### COUNT I
### Retaliation in Violation of the False Claims Act
### (31 U.S.C. § 3730(h)) - Against TidalHealth

84. Plaintiff incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

85. The False Claims Act provides that an employee shall be entitled to all relief necessary to make that employee whole if the employee is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the False Claims Act or other efforts to stop one or more violations of the False Claims Act, 31 U.S.C. § 3730(h)(1) (2018).

86. Plaintiff engaged in protected activity within the meaning of § 3730(h) when, in the course of her compliance and auditing duties, she identified, investigated, documented, and internally reported to TidalHealth's executive leadership and other members of executive leadership arrangements and practices she reasonably believed violated the Anti-Kickback Statute and the Stark Law and to have resulted in, or to be likely to result in, the submission of false or fraudulent claims to federal healthcare programs, and when she advised that Human Resources should be involved in addressing those matters. Plaintiff's internal reports and continued inquiry constituted lawful efforts to stop one or more violations of the False Claims Act.

87. TidalHealth had knowledge of Plaintiff's protected activity. Her reports were made directly to TidalHealth's executive leadership, and the Chief Administrative Officer responded by explicitly directing her to stop looking into the matters she had raised.

88. Because of Plaintiff's protected activity, TidalHealth discriminated against her in the terms and conditions of her employment, including by subjecting her to heightened scrutiny, confronting her twice about the Sealed Matter, and terminating her employment.

89. A causal connection exists between Plaintiff's protected activity and TidalHealth's adverse actions, as evidenced by, among other things: (a) the close temporal proximity - a matter of days - between her disclosures, the Chief Administrative Officer's directive that she stop looking into the matters she had raised, and her termination; (b) the absence of any legitimate explanation for TidalHealth's search into her background, the origin, purpose, and authorship of which TidalHealth has been unable to explain; (c) TidalHealth's shifting and inconsistent justifications for her termination; (d) TidalHealth's own separation documentation, which characterized the termination as an "involuntary separation due to operational issues"; (e) TidalHealth's procurement of a new consumer report on Plaintiff the next business day after it terminated her, in search of a justification after the fact; and (f) the Chief Administrative Officer's statement to Plaintiff, as she left, that she had done "too good a job."

90. As a direct and proximate result of TidalHealth's retaliation, Plaintiff has suffered damages, including lost wages and benefits, loss of future earning capacity, uninsured medical expenses, emotional distress and physical harm, and reputational injury.

91. Pursuant to 31 U.S.C. § 3730(h)(2) (2018), Plaintiff is entitled to all relief necessary to make her whole, including, but not limited to, reinstatement with the same seniority status she would have had but for the discrimination, two times the amount of back pay, interest

on the back pay, and compensation for special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

**COUNT II**
*(Replaces Count II of ECF 1 in its entirety)*
**Violation of the Fair Credit Reporting Act (15 U.S.C. § 1681b(f))**
(Against TidalHealth)

92. Plaintiff incorporates by reference paragraphs 1 through 91 as though fully set forth herein.

93. The Fair Credit Reporting Act regulates who may obtain a consumer report and for what purpose.

94. Plaintiff is a "consumer" as defined in 15 U.S.C. § 1681a(c). TidalHealth is a "person" as defined in 15 U.S.C. § 1681a(b). PreCheck is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and the Post-Termination Report is a "consumer report" as defined in 15 U.S.C. § 1681a(d)(1).

95. Section 1681b(f) provides that "[a] person shall not use or obtain a consumer report for any purpose unless, (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification."

96. TidalHealth obtained and used the Post-Termination Report without any purpose authorized by 15 U.S.C. § 1681b(a), in violation of 15 U.S.C. § 1681b(f).

97. In the alternative, to the extent TidalHealth contends it obtained the Post-Termination Report for employment purposes, it did so without a clear and conspicuous written disclosure and a written authorization covering a consumer report on a former employee, in violation of 15 U.S.C. § 1681b(b)(2)(A). Nor could the September 15, 2025 Form supply that disclosure: it was not "a document that consists solely of the disclosure." It combined the disclosure with an acknowledgment and certification, a blanket authorization for "any

law enforcement agency" and others "to furnish any and all background information," multi-state notices that still contain unfilled drafting brackets, and a California disclosure.

98. TidalHealth's violations of the FCRA were willful, entitling Plaintiff to statutory and punitive damages under 15 U.S.C. § 1681n. In the alternative, TidalHealth's violations were negligent, entitling Plaintiff to actual damages under 15 U.S.C. § 1681o (2018).

99. TidalHealth's violation invaded Plaintiff's privacy in the information the FCRA protects. That injury is closely related to the harm long recognized at common law as intrusion upon seclusion, and it caused Plaintiff distress on learning that a former employer had pulled a report on her after terminating her employment.

100. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs as provided by 15 U.S.C. §§ 1681n, 1681o (2018).

**COUNT III**
**Withdrawn**

Plaintiff no longer asserts the claim previously pleaded as Count III against John Doe Consumer Reporting Agency.

**COUNT IV**
**Wrongful Discharge in Violation of Maryland Public Policy**
**(Maryland Common Law) - Against TidalHealth (Pleaded in the Alternative)**

101. Plaintiff incorporates by reference paragraphs 1 through 100 as though fully set forth herein.

102. This claim is pleaded in the alternative to Plaintiff's statutory claims. Maryland recognizes a cause of action for wrongful discharge where an at-will employee is terminated in contravention of a clear mandate of public policy. To prevail, a plaintiff must establish that she was discharged, that the basis for the discharge violates a clear mandate of public policy, and that a nexus exists between the conduct and the termination.

103. Maryland law establishes a clear public policy: a person may not be required to disclose criminal-record information that legal process has removed from public access, and may not be discharged solely for declining to disclose it.

104. Under Md. Code Ann., Crim. Proc. § 10-109(a), disclosure of information about expunged criminal charges "may not be required" in an application, interview, or other means. A person "need not refer to or give information concerning an expunged charge when answering a question concerning . . . a criminal charge that did not result in a conviction." And a person's refusal to disclose that information "may not be the sole reason for . . . an employer to discharge" the person.

105. Under Md. Code Ann., Crim. Proc. § 10-306(b), an employer likewise may not require a person applying for employment to disclose shielded information about criminal charges, and may not discharge a person solely because the person refused to disclose it.

106. Read together, these statutes protect a person whose criminal records legal process has removed from public view from being compelled to discuss them, or discharged for declining to. That protection applies with greatest force where, as here, the person was not adjudicated guilty.

107. The Sealing Order is a judgment of a court of the State of Florida. Under the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, and 28 U.S.C. § 1738, it must be given the same effect in Maryland, and in this Court, that it has in Florida.

108. Under Florida law, the Sealing Order removed the records of the Sealed Matter from public access, and Plaintiff may lawfully decline to acknowledge the Sealed Matter to a private employer such as TidalHealth. See Fla. Stat. § 943.059.

109. On March 23 and March 27, 2026, TidalHealth questioned Plaintiff about the Sealed Matter, and each time she declined to discuss it. TidalHealth terminated her on March 27, 2026, the same day she declined for the second time.

110. In the alternative to Count I, Plaintiff's refusal to discuss the Sealed Matter was the sole reason TidalHealth terminated her. TidalHealth's stated reason, "operational issues," was a pretext, and TidalHealth did not begin re-verifying her employment history until after it had terminated her. TidalHealth discharged Plaintiff in violation of the clear mandate of public policy described above.

111. Upon information and belief, TidalHealth learned of the Sealed Matter from a news article (September 2012) published years before the Sealing Order was entered, not from any court record or consumer report. TidalHealth's own consumer reporting agency searched the Martin County where the Sealed Matter arose and reported "CLEAR."

112. A direct nexus exists between TidalHealth's violation of public policy and its decision to terminate Ms. Green.

113. Neither § 10-109 nor § 10-306 provides a civil remedy for its violation.

114. As a direct and proximate result of TidalHealth's wrongful discharge of Plaintiff, she has suffered damages, including lost wages and benefits, emotional distress, and other harm, in amounts to be proven at trial.

## VI. RESERVATION OF RIGHTS

115. Plaintiff reserves the right to amend this First Amended Complaint; and

116. Add additional claims or parties as warranted by facts revealed in discovery; and

117. Assert any additional claims arising from the same operative facts upon the exhaustion of any applicable administrative remedies, including the resolution of any charge pending before the Equal Employment Opportunity Commission. Nothing in this First Amended Complaint shall be construed as a waiver of any claim, right, or remedy available to Plaintiff at law or in equity.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Suzanne Green respectfully requests that this Honorable Court enter judgment in her favor and against Defendant TidalHealth and award the following relief:

a. Entry of judgment that TidalHealth violated the False Claims Act, 31 U.S.C. § 3730(h) (2018), and the Fair Credit Reporting Act;

b. Reinstatement of Plaintiff to her former position with the same seniority status she would have had but for TidalHealth's unlawful conduct, change in TidalHealth's employment-related policies, or in the alternative, an award of front pay in lieu of reinstatement;

c. Back pay, including lost wages, variable compensation, and the value of lost benefits, from the date of termination through the date of judgment, with prejudgment interest;

d. Two times the amount of back pay, with interest thereon, and special damages sustained as a result of the discrimination, pursuant to 31 U.S.C. § 3730(h)(2) (2018);

e. Compensatory damages for emotional distress, mental anguish, physical harm, humiliation, and reputational injury;

f. Actual, statutory, and punitive damages under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681n, 1681o (2018);

g. Punitive damages against TidalHealth for its willful and malicious conduct, in an amount to be determined at trial and subject to applicable statutory limits;

h. Plaintiff's reasonable attorneys' fees and costs pursuant to the False Claims Act, 31 U.S.C. § 3730(h)(2) (2018), and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681n, 1681o (2018);

i. Post-judgment interest at the maximum rate allowed by law; and

j. Such other and further relief as this Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Suzanne Green demands a trial by jury on all issues so triable.

Dated: October 23, 2026

Respectfully submitted,

/s/ Mohamed Bamba
**Mohamed Bamba, Esq. (Bar No. 21500)**
Bamba Law, LLC
10015 Old Columbia Road, Suite B-215
Columbia, MD 21046
Tel: (443) 656-8310 | Email:
mohamed@bambalaw.com
*Local Counsel for Plaintiff*

/s/ Zuneera Masood
**Zuneera Masood, Esq.**
*(Pro Hac Vice Admission Pending)*
Masood Law
100 Commerce Drive, Suite 304
Newark, DE 19713
Tel: (302) 387-0797 |
Email: zuneera@masoodlaw.com
Admitted in North Dakota
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 23, 2026, the foregoing Plaintiff's First Amended Complaint was filed through the Court's CM/ECF system, which will send notice of the filing to all counsel of record, including counsel for Defendant TidalHealth Peninsula Regional, Larry R. Seegull, Esq., Larry.Seegull@jacksonlewis.com Jackson Lewis P.C., 2800 Quarry Lake Drive, Suite 200, Baltimore, MD 21209.

/s/ Mohamed Bamba
Mohamed Bamba, Esq. (Bar No. 21500)