**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SUZANNE GREEN,<br><br>Plaintiff,<br><br>v.<br><br>TIDALHEALTH PENINSULA REGIONAL,<br><br>Defendant. | Civil Case No. 1:26-cv-02916-JKB |

**DEFENDANT'S OPPOSITION TO**
**<u>PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT</u>**

Larry R. Seegull (Bar No. 22991)
Jill S. Distler (Bar No. 26166)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
410.415.2000 (telephone)
410.415.2001 (facsimile)
Larry.Seegull@jacksonlewis.com
Jill.Distler@jacksonlewis.com

*Counsel for Defendant TidalHealth Peninsula Regional, Inc. d/b/a McCready Pavilion*

# TABLE OF CONTENTS


I. INTRODUCTION……………………………………………………………………...1

II. ALLEGATIONS IN THE AC…..…………………………………………………………2

A. Before Working For TidalHealth, Plaintiff Was The Subject Of A Florida Criminal Matter……………………………………………………..………......2

B. TidalHealth Hired Plaintiff As Senior Director Of Operations……………………2

C. During Her Employment, Plaintiff Conducted Audits Regarding Provider Schedules And Use Of PTO, And Those Audits Were Within The Scope Of Her Auditing And Compliance Duties As Senior Director Of Operations…………………..……………………………………………………..3

1. Plaintiff's Audit Of Provider Schedules Determined Providers Did Not Work Full Patient Loads As Expected………………………………...4

2. Plaintiff's Audit Of Provider Time Off Showed Providers Taking Excessive Time Off And Not Deducting Their PTO………………………4

D. Plaintiff Claims That She "Believed" The Practices She Identified In Her Audits Violated The Federal Anti-Kickback Statute And The Stark Law………….5

E. Plaintiff Reported Her Audit Findings To TidalHealth……………………………5

F. Cindy Lunsford Asked Plaintiff About A Florida News Article That Referenced Criminal Charges Brought Against Plaintiff In Florida……………………………6

G. TidalHealth Terminated Plaintiff's Employment For "Operational Issues"……….7

H. TidalHealth Ordered A New Consumer Report Regarding Plaintiff's Employment History………………………………………………………………7

III. STANDARD OF REVIEW……………………………………………………………..8

IV. ARGUMENT……………………………………………………………..…...…10

A. Count I Of The AC, Which Purports To Allege A Violation Of The False Claims Act, Cannot Survive A Motion To Dismiss……………………10

1. The AC Does Not Allege Facts To Plausibly Satisfy The First Element – Plaintiff Never Reported A Claim Under The FCA Or Otherwise Engaged In Protected Activity………………………………..12

a) The AC Does Not Identify Any False Claim That Was Submitted To The Government Or That Plaintiff Reasonably Believed Would Be Submitted To The Government……………..12

b) The AC Does Not Sufficiently Allege That Plaintiff Reasonably Believed There Were Violations Of The AKS Or The Stark Law That Could Support Her FCA Retaliation Claim…………………..……..……………………13

c) Plaintiff's Concerns Did Not Relate To The AKS……………….13

d) Plaintiff's Audit Finding Did Not Relate To Referrals Or The Stark Law……………………………………………………14

e) Plaintiff Conducted The Audits, And Reported Her Findings To TidalHealth, As Part Of Her Audit and Compliance Role, Not Because Of A Belief That TidalHealth Violated The FCA…………………………………………………………16

2. The AC Does Not Allege Facts To Plausibly Satisfy The Second Element Of An FCA Claim - There Are Insufficient Allegations That TidalHealth Viewed Plaintiff As A Whistleblower…………………17

B. Count II Of The AC, Which Purports To Allege A Violation Of The Fair Credit Reporting Act, Cannot Survive A Motion To Dismiss………………..18

1. TidalHealth Ordered The Report While Plaintiff Was Still Employed And, Therefore, Ordered It For A Permissible Purpose………19

2. Plaintiff's Alternative Theory Also Fails ...……………………………20

C. Count IV Of The AC, Which Purports To Allege A Wrongful Discharge Claim, Cannot Survive A Motion To Dismiss……………………...…22

1. Wrongful Discharge Is A Narrow Exception To At-Will Employment…..23

2. The AC Does Not Allege Sufficient Facts To Establish That § 10-109 Or § 10-306(b), Even When Read Together, Contain A Broad Pronouncement Of Public Policy Or That They Even Apply To The Facts Plaintiff Alleged……………………………..24

a) Section 10-109 Prohibits Certain Conduct With Respect To Police Or Court Records Expunged Under Maryland Law………24

b) Section 10-306(b) Prohibits Certain Conduct With Respect To Convictions Under Certain Enumerated Maryland Statutes…..26

c) The Full Faith And Credit Clause Does Not Save Plaintiff's Claim……………………………………………27

d) The AC Does Not Allege Facts To Establish That TidalHealth Otherwise Engaged In Any Of The Conduct Prohibited By § 10-109(a) Or § 10-306(b) ……………………..…28

e) Maryland Public Policy Simply Does Not Prohibit Reliance On News Articles About Past Criminal Records…..…………………30

V. CONCLUSION……………………………………………………………………..30

## I. INTRODUCTION

Plaintiff, Suzanne Green ("Plaintiff") filed this lawsuit against her former employer, TidalHealth Peninsula Regional, Inc. ("TidalHealth"). Plaintiff's Complaint contained the following claims:

> Count I – retaliation in violation of the False Claims Act ("FCA"), against TidalHealth;
>
> Count II – violation of the Fair Credit Reporting Act ("FCRA"), against TidalHealth;
>
> Count III – violation of the FCRA, against John Doe Credit Reporting Agency ("John Doe CRA"); and
>
> Count IV – wrongful discharge in violation of Maryland public policy, against TidalHealth.

On September 25, 2026, TidalHealth moved to dismiss all counts against it (Counts I, II, and IV) for failure to state claims upon which relief can be granted ("Motion to Dismiss"). Instead of opposing TidalHealth's Motion to Dismiss, Plaintiff sought to file an amended complaint. Because Plaintiff did not amend her complaint within twenty-one days of the filing of TidalHealth's Motion to Dismiss, she must obtain leave of court to amend. Fed. R. Civ. P. 15(a)(1) and (2). Accordingly, on October 23, 2026, Plaintiff filed the Motion for Leave To File First Amended Complaint ("Motion for Leave").[1]

Plaintiff's Proposed First Amended Complaint ("AC")[2] adds additional factual allegations regarding Count I, completely changes the factual and legal theories of Counts II and IV, and withdraws Count III against John Doe CRA. Although Plaintiff's Motion for Leave claims that

---

[1] In light of the filing of Plaintiff's Motion for Leave, on October 27, 2026, the Court denied TidalHealth's Motion to Dismiss without prejudice to TidalHealth renewing its Motion to Dismiss if the Court denies Plaintiff's Motion for Leave.

[2] As did the caption of Plaintiff's original Complaint, the caption of the AC states "TidalHealth Peninsula Regional, its affiliates, subsidiaries, and other related entities, under any name by which they are known," but it does not name any of those supposed affiliates, subsidiaries, or related entities.

the AC addresses the issues raised in TidalHealth's Motion to Dismiss, the Motion for Leave does not explain how the AC cures any of them. In fact, the new factual and legal theories in the AC are themselves deficient. As discussed below, the claims against TidalHealth in the AC are subject to dismissal for failure to state claims upon which relief can be granted. Accordingly, allowing the filing of the AC would be futile, and the Court should deny Plaintiff's Motion for Leave. Because futility is measured under the Rule 12(b)(6) standard, the arguments below also establish that, if the AC were filed, Counts I, II, and IV would be subject to dismissal.

## II. ALLEGATIONS IN THE AC.[3]

### A. Before Working For TidalHealth, Plaintiff Was The Subject Of A Florida Criminal Matter.

Before working for TidalHealth, Plaintiff resided in Florida. (AC ¶¶ 14-15.) When she was living in Florida, she "was the subject of a Florida criminal matter in which she was not adjudicated guilty (the 'Sealed Matter')." (AC ¶ 18.) "On September 9, 2016, the Circuit Court of the Nineteenth Judicial Circuit of Florida entered an 'Order to Seal Records' directing that the records of the Sealed Matter be sealed (the 'Sealing Order')," and the "Sealing Order found that Plaintiff 'was not adjudicated guilty.'" (AC ¶ 18.)

### B. TidalHealth Hired Plaintiff As Senior Director of Operations.

TidalHealth is a healthcare organization. (AC ¶ 6.) In the Fall of 2025, while Plaintiff was residing in Florida, TidalHealth recruited her to work in an auditing and compliance role at its Salisbury, Maryland facility. (AC ¶¶ 5, 13-14, 16.) As part of the hiring process, on September 15, 2025, Plaintiff signed a form titled "Background Check Consent" through TidalHealth's applicant tracking system, and the form combined a disclosure and an authorization to obtain consumer reports. (AC ¶ 19.) That September 15, 2025, "Background Check Consent" form is

[3] The facts alleged in the AC are accepted as true for the purposes of this Opposition only.

attached as Exhibit 1 and states that Plaintiff authorized TidalHealth to obtain any consumer report "at any time after receipt of this authorization and, if I am hired, throughout my employment." (Exhibit 1.)

TidalHealth "conducted a pre-employment background investigation of Plaintiff consistent with its standard screening policy, which provides for a ten-year lookback period." (AC ¶ 17.) Specifically, TidalHealth ordered a consumer report regarding Plaintiff from PreCheck, Inc. ("PreCheck"), which is a "consumer reporting agency." (AC ¶¶ 20-21.) On November 26, 2025, PreCheck delivered to TidalHealth a consumer report regarding Plaintiff ("Pre-Employment Report"). (AC ¶ 22.) That report included criminal-record searches that "covered the Florida county in which the Sealed Matter arose and in which the Sealing Order was entered," and those criminal-record searches returned a "CLEAR" result. (AC ¶¶ 23-24.) The report also verified Plaintiff's most recent employer but did not verify any earlier employment. (AC ¶ 26.)

The results of the background investigation were satisfactory, and TidalHealth hired Plaintiff. (AC ¶ 17.) She therefore moved from Florida to Delaware and began working at TidalHealth on December 1, 2025, as Senior Director of Operations. (AC ¶¶ 11, 14-16.) She commuted daily from Delaware to TidalHealth's Salisbury, Maryland facility. (AC ¶¶ 5, 16.)

### C. During Her Employment, Plaintiff Conducted Audits Regarding Provider Schedules And Use Of PTO, And Those Audits Were Within The Scope Of Her Auditing And Compliance Duties As Senior Director Of Operations.

In her Senior Director of Operations role, which Plaintiff explicitly characterizes as an "auditing and compliance role," Plaintiff "was responsible for ensuring regulatory compliance including compliance with the Health Insurance Portability and Accountability Act ('HIPAA')." (AC ¶¶ 11, 13.) The AC alleges that within months of her hire, she "performed precisely the work for which she was retained: she identified and internally reported significant financial

improprieties and operational deficiencies within TidalHealth's organization." (AC ¶ 2.) The AC admits this was done "in the ordinary course of her auditing and compliance duties." (AC ¶ 27.)

### 1. Plaintiff's Audit Of Provider Schedules Determined Providers Did Not Work Full Patient Loads As Expected.

Plaintiff, "as part of her role, conducted an audit of provider schedules." (AC ¶ 32.) The AC claims that standard office hours were from 8 a.m. to 5 p.m., and that TidalHealth's providers were expected to see patients from approximately 8 a.m. to 12 p.m. and 1 p.m. to 4:30 p.m., with administrative time built into their schedules. (AC ¶ 33.) The AC further alleges that, based on provider contracts, providers were "expected to perform 34-36 hours of face-to-face patient care each week with four to six (4-6) hours of administrative time." (AC ¶ 34.) Plaintiff's audit allegedly revealed that (1) approximately 85-90% of providers were only working 24 to 28 patient care hours per week, which is below their contractual obligations, and (2) providers blocked their schedules so that patient appointments did not begin until 9 a.m. and ended as early as 3:30 p.m., thus reducing patient access and organizational revenue. (AC ¶¶ 35-36.)

### 2. Plaintiff's Audit Of Provider Time Off Showed Providers Taking Excessive Time Off And Not Deducting Their PTO.

Further acting in her "official capacity," Plaintiff conducted an audit of provider time off beginning in 2025.[4] (AC ¶ 37.) Her audit allegedly revealed that (1) "providers were taking half-days, full days, and even extended periods away from work without properly recording their leave in the payroll system," which resulted in paid time off not being "deducted from their PTO banks while they continued receiving their regular compensation," (2) "at the end of 2025, providers and employees who were absent from work received additional PTO payouts in situations where leave

[4] As stated above, Plaintiff did not commence her employment until December 1, 2025. (AC ¶ 16). Thus, Plaintiff was not even able to begin conducting this audit until very late in 2025 and, therefore, conducted it in a short period of time.

had not been properly recorded," and (3) "certain neurologists and neurosurgeons were earning compensation in excess of eight hundred and fifty thousand dollars ($850,000) annually while averaging approximately fifteen (15) hours of patient care per week." (AC ¶¶ 38-39, 41.)

### D. Plaintiff Claims That She "Believed" The Practices She Identified In Her Audits Violated The Federal Anti-Kickback Statute And The Stark Law.

The AC alleges that Plaintiff believed the practices she identified in her audits violated the federal Anti-Kickback statute, ("AKS"), 42 U.S.C. § 1320a-7b(b) and the federal physician self-referral law (the "Stark Law"), 42 U.S.C. § 1395nn. (AC ¶ 30.) The AC alleges that Plaintiff "questioned" whether the physician compensation arrangements in the neurology department potentially exceeded fair market value and whether the retention of highly compensated physicians was for reasons other than for the clinical services they provided (*e.g.*, such as to maintain the hospital's trauma center designation). (AC ¶ 30.) It also alleges that, "[u]pon information and belief, the neurologists and neurosurgeons whose compensation Plaintiff questioned referred patients to TidalHealth for designated health services within the meaning of the Stark Law, including inpatient and outpatient hospital services and imaging, for which TidalHealth submitted claims to Medicare." (AC ¶ 42.)

### E. Plaintiff Reported Her Audit Findings To TidalHealth.

In or about February 2026, Plaintiff reported her audit findings to members of TidalHealth's directors and executive leadership and advised that TidalHealth's Human Resources functions should be involved in addressing the issues she had identified. (AC ¶ 45.) The AC alleges that, rather than investigate or address her findings, on March 12, 2026, TidalHealth's Chief Administrative Officer, Tres Pelot, directed her to stop looking into the issues she had raised. (AC ¶ 46.) Plaintiff was also informed that "leadership wanted to preserve the service line despite the financial impact." (AC ¶ 43.) Further, the AC claims that during discussions regarding her

audit findings, Vice President of Finance Jim Kanuck commented that there appeared to be "Stark issues" associated with the providers' arrangements. (AC ¶ 43.) "Stark" is apparently a reference to the Stark Law, a "federal physician self-referral law." (AC ¶ 30.)

### F. Cindy Lunsford Asked Plaintiff About A Florida News Article That Referenced Criminal Charges Brought Against Plaintiff In Florida.

On March 23, 2026, Cindy Lunsford, TidalHealth's Executive Vice President/Chief Operations Officer and President, met with Plaintiff and "opened a file that contained a printout of a years-old news article concerning the Sealed Matter." (AC ¶¶ 50-51.) As Plaintiff admitted in her original Complaint, that news article is a TCPalm news article. (Compl. ¶ 42.) The news article is attached as Exhibit 2 and available at https://archive.tcpalm.com/news/vero-beach-woman-former-stuart-ceo-facing-fraud-and-theft-charges-ep-381976382-342995152.html/. The article, dated September 17, 2012, is from a Florida news site and is titled, "Vero Beach woman, former Stuart CEO, facing fraud and theft charges."

The article states that, as of September 17, 2012, Plaintiff was "facing fraud and theft charges after state insurance investigators said she received payments for submitting fraudulent claims, according to an arrest report." (Exhibit 2.) Although the AC states that the article concerned the "Sealed Matter" (AC ¶ 51), there is nothing in that September 2012 article that in any way suggests that the record had been sealed. (Exhibit 2.) Nor could it; the article was dated 2012, and the record was not sealed until 2016. (Exhibit 2; AC ¶ 18.)

The AC alleges that Ms. Lunsford asked Plaintiff about the article, to which Plaintiff responded, "You did a background check on me. I passed my background check." (AC ¶ 51.) The AC also claims that, on March 27, 2026, Ms. Lunsford again asked Plaintiff about the matter and that Plaintiff declined to discuss it, responding yet again, "You did a background check on me. I passed my background check." (AC ¶¶ 52-53.)

### G. <u>TidalHealth Terminated Plaintiff's Employment For "Operational Issues."</u>

Ms. Lunsford subsequently terminated Plaintiff's employment and presented Plaintiff with a severance agreement that referenced "operational issues." (AC ¶¶ 54-55.) The severance documents (which Plaintiff did not sign) identified her separation date as March 27, 2026, and stated that she would not seek reemployment with TidalHealth. (AC ¶¶ 55-56.) After Plaintiff was let go, Tres Pelot, Chief Administrative Officer and Plaintiff's supervisor, allegedly told Plaintiff, "For what it's worth, you did a great job, too good a job." (AC ¶ 54.)

### H. <u>TidalHealth Ordered A New Consumer Report Regarding Plaintiff's Employment History.</u>

The AC alleges that "[u]pon information and belief, after terminating Plaintiff, TidalHealth ordered a new consumer report on her from PreCheck under the same client account" and that PreCheck's records show that it began work on the new report on Monday, March 30, 2026, the next business day after TidalHealth terminated Plaintiff's employment. (AC ¶ 61.) The AC alleges that when TidalHealth ordered and obtained the new report, Plaintiff was no longer TidalHealth's employee and had not applied for any position with TidalHealth; that the new report covered employment history only and did not include any criminal history search; and that the employment information TidalHealth provided for the new report included employers that the Pre-Employment Report had not verified. (AC ¶¶ 62-63.) In addition, the AC alleges that PreCheck delivered the new report to TidalHealth on April 6, 2026. (AC ¶ 64.) Plaintiff did not authorize TidalHealth to obtain a consumer report on her after her employment ended. (AC ¶ 67.)

Although the AC claims that, "[u]pon information and belief," TidalHealth ordered the new report after it terminated Plaintiff's employment (AC ¶ 61), as demonstrated in Exhibit 3, the report was actually ordered on March 24, 2026, three days <u>***before***</u> Plaintiff's termination. (Exhibit 3.) Thus, Plaintiff was still a TidalHealth employee when the report was ordered.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave when justice so requires." The rule embodies a preference for resolving claims on their merits, but leave is not automatic. A court may deny amendment for "undue delay, bad faith or dilatory motive," "repeated failure to cure deficiencies by amendments previously allowed," "undue prejudice to the opposing party," or "futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Futility is the controlling ground here.

An amendment is futile when the proposed claim would not survive a motion to dismiss. *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995). The Court therefore applies the Rule 12(b)(6) standard, which permits a court to dismiss claims in a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss tests the sufficiency of the complaint. *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). To survive a motion to dismiss, a plaintiff is obligated to "provide the grounds of his entitlement to relief," including "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Ogueri v. Kinney*, 2024 U.S. Dist. LEXIS 30101, at *4-5 (D. Md. Feb. 22, 2024). A complaint may withstand a motion to dismiss if it contains plausible factual allegations that demonstrate something more than the "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "requires more than labels and conclusions…a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Although a court evaluating a motion to dismiss must assume that all facts in the complaint are true, it need not accept unsupported legal allegations or accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).

Conclusory assertions are insufficient. *See Giarratano*, 521 F.3d at 304. A complaint's factual allegations "must be enough to raise a right to relief above the speculative level…on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

In ruling on a motion to dismiss, courts are permitted to consider documents outside the complaint which are referenced in, or integral to, the allegations in the complaint, as well as matters of public record, without converting the motion into a summary judgment motion. *See Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (in reviewing a Rule 12(b)(6) dismissal, the court can consider documents attached to a motion to dismiss, as long as those documents are "integral to the complaint and authentic" and the court also can "take judicial notice of matters of public record"). Accordingly, the Court can consider Plaintiff's September 15, 2025, Background Check Consent form (Exhibit 1), the TCPalm news article (Exhibit 2), and TidalHealth's March 24, 2026, request for a report concerning Plaintiff's employment history (Exhibit 3(A)), as those documents are referenced in and integral to the AC. (AC ¶¶ 19, 51, 61.) Moreover, the article (Exhibit 2) is also a matter of public record because it is on a publicly accessible website. *See* https://archive.tcpalm.com/news/vero-beach-woman-former-stuart-ceo-facing-fraud-and-theft-charges-ep-381976382-342995152.html/. TidalHealth offers Exhibit 2 only for the fact that the information was published and is publicly of record — the fact bearing on what TidalHealth personnel could locate — and not for the truth of the matters reported therein.

Although leave is to be freely given, it is properly denied where, as here, the proposed amendment would be futile. The proposed claims, even with the new theories asserted in the AC, remain legally deficient and would not survive a motion to dismiss. Allowing amendment therefore would not advance resolution on the merits.

## IV. ARGUMENT

### A. Count I Of The AC, Which Purports To Allege A Violation Of The False Claims Act, Cannot Survive A Motion To Dismiss.

As demonstrated in TidalHealth's Motion to Dismiss, Count I of the original Complaint failed to state an FCA retaliation claim upon which relief can be granted. In response, the AC has simply added the following conclusory, speculative allegation: "Upon information and belief, the neurologists and neurosurgeons whose compensation Plaintiff questioned referred patients to TidalHealth for designated health services within the meaning of the Stark Law, including inpatient and outpatient hospital services and imaging, for which TidalHealth submitted claims to Medicare." (AC ¶ 42.) As discussed below, this does not save Plaintiff's claim, and the claim remains deficient.

The False Claims Act ("FCA") "protects the government against false claims that are presented to it in federal contracts." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018). Specifically, it prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" or "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2).

The FCA also prohibits retaliation. Specifically, its anti-retaliation provision provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

Count I of the AC alleges that TidalHealth violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h), by confronting Plaintiff about the Sealed Matter, and terminating her employment, in retaliation for internally reporting her audit findings. The AC alleges that Plaintiff made internal reports concerning her audit findings, namely physician compensation arrangements in the Neurology department that she believed exceeded fair market value, as well as provider scheduling and timekeeping irregularities, and that Plaintiff suspected that these practices constituted violations of the AKS and the Stark Law. (AC ¶ 30.) In an attempt to tie this alleged activity to the FCA and manufacture an FCA retaliation claim, the AC makes the broad, conclusory allegations that TidalHealth "submits claims for payment to federally funded healthcare programs, including Medicare and Medicaid," and that Plaintiff reasonably believed that the practices she had identified "had resulted in, or would result in, the submission of false or fraudulent claims to federal healthcare programs, fraudulently maintaining the hospital's trauma center designation, and [that] she undertook efforts to stop those violations, including by investigating, documenting, and internally reporting them." (AC ¶¶ 31, 44, 86.) Like the original Complaint, the AC, therefore, generally alleges that Plaintiff's internal reports were protected activity because they constituted efforts to stop one or more violations of the FCA.

To plead retaliation under the FCA, a plaintiff must allege that: (1) she engaged in protected activity; (2) her employer knew about the protected activity; and (3) the employer took adverse action against her as a result. *See LeVerette v. Louis Berger United States, Inc.*, No. 22-1891, 2024 U.S. App. LEXIS 12419, at *2 (4th Cir. May 23, 2024) (per curiam) (citing *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013)); *Smith v. Clark/Smoot/Russell, AJV*, 796 F.3d 424, 433 (4th Cir. 2015). Like the original Complaint, the AC fails to state an FCA retaliation claim upon which

relief can be granted because it does not plausibly allege that Plaintiff engaged in protected activity under the FCA or that TidalHealth knew of it.

**1. <u>The AC Does Not Allege Facts To Plausibly Satisfy The First Element – Plaintiff Never Reported A Claim Under The FCA Or Otherwise Engaged In Protected Activity.</u>**

As to the first element, the FCA defines two types of "protected activity": acts "in furtherance of an [FCA action]" (the "first prong") or "other efforts to stop 1 or more [FCA violations]" (the "second prong"). 31 U.S.C. § 3730(h)(1). The AC continues to rely on the second prong and alleges that by reporting her audit findings, she was engaged in efforts to stop one or more FCA violations. The Fourth Circuit applies an "objective reasonableness standard for protected activity" under that second prong. *Grant*, 912 F.3d at 201. Under that standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* "A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.* "[W]hile the plaintiff's actions need not 'lead to a viable FCA action,' . . . they must still have a nexus to an FCA violation." *Id.*

**a) <u>The AC Does Not Identify Any False Claim That Was Submitted To The Government Or That Plaintiff Reasonably Believed Would Be Submitted To The Government.</u>**

The AC does not sufficiently allege facts to satisfy the objective reasonableness standard or to tie any of Plaintiff's actions to an FCA violation. The AC makes broad, conclusory allegations that TidalHealth "submits claims for payment to federally funded healthcare programs, including Medicare and Medicaid," and that Plaintiff reasonably believed that the practices she had identified "had resulted in, or would result in, the submission of false or fraudulent claims to federal healthcare programs, fraudulently maintaining the hospital's trauma center designation,

and she undertook efforts to stop those violations, including by investigating, documenting, and internally reporting them." (AC ¶¶ 31, 44, 86.) The AC, however, does not identify ***any*** false claim that was submitted to the government or that Plaintiff reasonably believed would be submitted to the government. She has thus failed to satisfy the objective reasonableness standard. *See Carlson v. DynCorp Int'l LLC*, 657 Fed. Appx. 168, 173-74 (4th Cir. 2016) (affirming dismissal of FCA retaliation claim where the complaint did not contain enough factual matter to suggest that the employer made or was about to make a false claim to the government and, as a result, plaintiff's alleged belief that fraud had occurred or was going to occur was "entirely speculative" as opposed to objectively reasonable).

**b) The AC Does Not Sufficiently Allege That Plaintiff Reasonably Believed There Were Violations Of The AKS Or The Stark Law That Could Support Her FCA Retaliation Claim.**

In an attempt to manufacture an FCA retaliation claim, the AC (as did the original Complaint) alleges that Plaintiff reasonably believed that the issues she had identified during her audits violated the AKS and the Stark Law. The AC makes the conclusory allegation that "[c]laims for items or services resulting from a violation of the Anti-Kickback Statute constitute false or fraudulent claims for purposes of the False Claims Act" and that "[c]laims arising from referrals prohibited by the Stark Law are likewise not properly payable by federal healthcare programs." (AC ¶ 31.) The AC, however, does not allege sufficient facts to demonstrate that Plaintiff had an objectively reasonable belief that the issues uncovered during her audits established a violation of either the AKS or the Stark Law.

**c) Plaintiff's Concerns Did Not Relate To The AKS.**

The AKS prohibits knowingly and willfully soliciting, receiving, offering, or paying any remuneration – directly or indirectly, overtly or covertly, in cash or in kind – to induce or reward referrals for items or services under federal healthcare programs. 42 U.S.C. § 1320a-7b(b). The

AKS further states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the [FCA]." *Id.* § 1320a-7b(g). Here, however, the AC (which adds no new allegations relating to the AKS theory of the original Complaint) fails to allege facts to establish the applicability of the AKS to Plaintiff's audit findings.

The elements of an AKS violation are: "(1) there was remuneration (2) offered or paid by the defendants, (3) with the requisite knowing-and-willful intent that at least one purpose of the remuneration was to induce referrals (4) for items or services payable under a federal healthcare program." *United States ex rel. Kyer v. Thomas Health Sys.*, 178 F.4th 119, 136 (4th Cir. 2026). The AC does not allege facts to demonstrate these elements or to otherwise establish that Plaintiff had an objectively reasonable belief that any violation of the AKS was occurring and would lead to a violation of the FCA. For example, there are no allegations that TidalHealth offered or paid any remuneration to induce any referrals for items or services under Medicare or Medicaid. Absent facts showing that Plaintiff had an objectively reasonable belief that TidalHealth was violating the AKS, the FCA retaliation claim cannot be based on the AKS. *See Cox v. Red Hat, Inc.*, 2024 U.S. Dist. LEXIS 5643, at *33-34 (E.D. Va. Jan. 9, 2024) (in dismissing FCA retaliation claim, the court found plaintiff had not plausibly alleged a violation of the AKS and therefore failed to allege protected activity under the FCA).

**d) Plaintiff's Audit Finding Did Not <u>Relate To Referrals Or The Stark Law.</u>**

The Stark Law "limits efforts by healthcare providers to profit from the overutilization of medical services paid for by Medicare." *Kyer*, 178 F.4th at 130. "It prohibits any physician who has a 'financial relationship' with a hospital (or other entity) from making a 'referral' to that hospital for the furnishing of 'designated health services' paid by Medicare." *Id.* (citing 42 U.S.C.

§ 1395nn(a)(1)). "If the physician makes a prohibited referral, the hospital may not bill Medicare for those referred services." *Id.*

The elements of a Stark Law violation are "(1) a physician (2) with a prohibited financial relationship with the hospitals (3) made a referral (4) for a designated health service [as that term is defined in the Stark Law], and (5) that a hospital then submitted a claim to Medicare for that service." *Id.* Plaintiff's AC does not allege facts to demonstrate these elements or to otherwise establish that she had an objectively reasonable belief that any violation of the Stark Law was occurring and would lead to a violation of the FCA. Like the original Complaint, the AC makes the vague and conclusory allegation that "[c]laims arising from referrals prohibited by the Stark Law are . . . not properly payable by federal healthcare programs." (AC ¶ 31.) Apparently recognizing that this allegation is insufficient, the AC adds the following additional conclusory allegation: "Upon information and belief, the neurologists and neurosurgeons whose compensation Plaintiff questioned referred patients to TidalHealth for designated health services within the meaning of the Stark Law, including inpatient and outpatient hospital services and imaging, for which TidalHealth submitted claims to Medicare." (AC ¶ 42). This speculative allegation, based solely on "information and belief," is devoid of facts and merely repeats the elements of a Stark Law violation; it is nothing more than "a formulaic recitation of the elements of a cause of action," which "will not do." *Twombly*, 550 U.S. at 555. In short, there are absolutely no ***facts*** alleged to demonstrate that any TidalHealth physicians with a financial relationship to TidalHealth referred "designated health services" to TidalHealth and that TidalHealth billed Medicare for those services. And, although the AC alleges that Vice President of Finance Jim Kanuck commented that there appeared to be "Stark issues," that comment does not mean that there were violations of the Stark Law, and it does not cure the AC's failure to allege any facts that

could plausibly establish such a violation of the Stark Law or demonstrate that Plaintiff had an objectively reasonable belief that TidalHealth was violating the Stark Law and, in turn, the FCA.

In summary, the AC does not allege facts to plausibly establish violations of the AKS or the Stark Law. In turn, Plaintiff cannot rely on such alleged violations to establish the protected activity element of her FCA retaliation claim. Thus, even though an FCA retaliation claim need only pass muster under the pleading standard in Rule 8 of the Federal Rules of Civil Procedure, Plaintiff has not satisfied it here.

**e) Plaintiff Conducted The Audits, And Reported Her Findings To TidalHealth, As Part Of Her Audit And Compliance Role, Not Because Of A Belief That TidalHealth Violated The FCA.**

As discussed above, under the objective reasonableness standard, "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Grant*, 912 F.3d at 201. "A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA." *Id.*

Significantly, the AC continues to make it clear that Plaintiff conducted the audits, and reported her findings to TidalHealth, ***because that was what TidalHealth had hired her to do***. The AC explicitly states that Plaintiff was hired as Senior Director of Operations, which is "an ***auditing and compliance role***;" she conducted the audit of provider schedules and provider time off "***as part of her role***;" "***in the ordinary course of her auditing and compliance duties,***" she identified the issues that she reported to TidalHealth; and by identifying and reporting the issues, she "***performed precisely the work for which she was retained***." (AC ¶¶ 2, 11, 13, 27, 32, 37.) Therefore, as the AC makes clear, she reported her findings internally because that was her job, not because she believed TidalHealth was violating the FCA or because she was trying to stop

FCA violations. This further demonstrates Plaintiff's inability to establish the first element of an FCA retaliation claim.

**2. <u>The AC Does Not Allege Facts To Plausibly Satisfy The Second Element Of An FCA Claim – There Are Insufficient Allegations That TidalHealth Viewed Plaintiff As A Whistleblower.</u>**

The second element is that the employer "knew about the protected activity." *LeVerette v. Louis Berger United States, Inc.*, No. 22-1891, 2024 U.S. App. LEXIS 12419, at *2 (4th Cir. May 23, 2024). There are no facts alleged to establish that TidalHealth was aware that Plaintiff was acting as a whistleblower and engaging in efforts to stop violations of the FCA. Vice President of Finance Jim Kanuck's alleged comment that there appeared to be "Stark issues" (AC ¶ 43) does not change this result. At most, that comment reflects one executive's own observation about a potential regulatory issue; it does not suggest that Plaintiff was reporting fraud on the federal government, or that TidalHealth understood her to be doing so. Likewise, Mr. Pelot's alleged post-termination remark that Plaintiff did "too good a job" (AC ¶ 54) says nothing about whether TidalHealth knew Plaintiff was engaged in efforts to stop FCA violations, as opposed to performing the auditing work she was hired to do. That deficiency is especially significant here, where Plaintiff pleads that auditing and compliance reporting was the very work she was hired to perform: an employer cannot be placed on notice of protected activity by receiving precisely the reports it engaged the employee to generate, absent allegations that the employee communicated concerns about fraud on the federal government as distinct from operational or regulatory concerns. Rather, as discussed above, Plaintiff conducted the audit, and reported her findings internally, because that is what TidalHealth had hired her to do. The AC does not allege that Plaintiff's internal reports put TidalHealth on notice that she was reporting potential fraud in violation of the FCA rather than reporting general operational concerns.

### B. Count II Of The AC, Which Purports To Allege A Violation Of The Fair Credit Reporting Act, Cannot Survive A Motion To Dismiss.

Like the original Complaint, Count II of the AC purports to assert a violation of the Fair Credit Reporting Act ("FCRA"). However, the AC completely changes the theory upon which Count II is based. The original Complaint relied solely on TidalHealth obtaining the TCPalm article regarding Plaintiff's 2012 arrest in Florida as the basis for the FCRA claim. The AC abandons that theory, apparently acknowledging that such a theory is deficient, as TidalHealth had demonstrated in its Motion to Dismiss. In fact, the AC no longer alleges any violation of the FCRA in connection with that article or in connection with TidalHealth obtaining information regarding Plaintiff's criminal history. Rather, the AC completely switches gears and claims that after Plaintiff's employment was terminated, TidalHealth ordered a "consumer report" regarding Plaintiff's prior employment history, without any permissible purpose, in violation of 15 U.S.C. § 1681b(f). As discussed below, Plaintiff's FCRA claim cannot survive a motion to dismiss.

Section 1681b(f) of the FCRA states:

> A person shall not use or obtain a consumer report for any purpose unless—
>
> > **(1)** the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
> >
> > **(2)** the purpose is certified in accordance with section 607 [15 USCS § 1681e] by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f). In other words, § 1681b(f) "prohibits persons from 'us[ing] or obtain[ing] a consumer report for any purpose' unless that purpose is expressly authorized by the FCRA." *Suit v. Direct TV, LLC*, 2012 U.S. Dist. LEXIS 166560, at *3 (D. Md. Nov. 20, 2012) (Bredar, J.) (quoting 15 U.S.C. § 1681b(f)). "To state a claim for improper use or acquisition of a consumer report, Plaintiff must plead the following elements: (i) that there was a consumer report; (ii) that Defendant used or obtained it; (iii) that Defendant did so without a permissible statutory purpose;

and (iv) that Defendant acted with the specified culpable mental state." *Id.* at *3-4. The AC alleges that TidalHealth obtained and used a consumer report after it terminated Plaintiff's employment, meaning that it had no purpose. As discussed below, the FCRA claim fails.

### 1. TidalHealth Ordered The Report While Plaintiff Was Still Employed And, Therefore, Ordered It For A Permissible Purpose.

TidalHealth did not use or obtain the consumer report without a permissible statutory purpose. The FCRA authorizes a consumer report for "employment purposes." 15 U.S.C. § 1681b(a)(3)(B). Under the FCRA, "[t]he term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment ***or retention as an employee***." *Id.* § 1681a(h) (emphasis added). The AC's entire FCRA claim is based on the speculation that TidalHealth ordered the report after Plaintiff's employment was terminated on March 27, 2026. (AC ¶ 61, stating, "***Upon information and belief,*** after terminating Plaintiff, TidalHealth ordered a new consumer report on her from PreCheck." (emphasis added); *see also* AC ¶ 3, stating that TidalHealth "began obtaining a new consumer report on Plaintiff" the next business day after her termination; AC ¶ 62, alleging that Plaintiff was no longer TidalHealth's employee when TidalHealth ordered the report). However, as demonstrated in the record reflecting TidalHealth's request for the report, TidalHealth requested the report on March 24, 2026, ***three days before Plaintiff's March 27, 2026 termination*.** (Exhibit 3.) Therefore, the AC's entire FCRA theory fails because ***TidalHealth ordered the report while Plaintiff was still a TidalHealth employee***. Moreover, as reflected in Exhibit 1, which is explicitly referenced in paragraph 19 of the AC, Plaintiff had specifically authorized TidalHealth to obtain consumer reports "throughout [her] employment." (Exhibit 1; *see also* AC ¶ 67.) She had therefore authorized TidalHealth to obtain consumer reports at any time while she was employed. How long it actually took PreCheck to begin working on the request

or to provide that report was beyond TidalHealth's control. Notably, the only factual allegation in the AC on this point concerns when PreCheck began work on the report (AC ¶ 61); the AC alleges no fact showing when TidalHealth placed the order. The allegation that TidalHealth ordered the report after Plaintiff's termination rests solely on "information and belief."

The AC also fails to allege facts to demonstrate that TidalHealth actually ***used*** that new consumer report for any reason, impermissible or otherwise. Although the AC alleges that the report was delivered to TidalHealth's Director of Talent Acquisition, Allison Hamilton (AC ¶ 64), there is no allegation that Ms. Hamilton did anything with the report. Rather, the AC simply alleges that "[u]pon information and belief, TidalHealth obtained the [report] to look for a reason, after the fact, to justify the termination it had already carried out and documented." (AC ¶ 68.) This is simply pure speculation unsupported by any facts, and it is completely undermined by the fact that the report was ordered prior to Plaintiff's termination.

### 2. Plaintiff's Alternative Theory Also Fails.

The AC claims, in the alternative, that even if TidalHealth obtained the new report for employment purposes, it obtained it without a clear and conspicuous written disclosure and a written authorization covering a consumer report on a former employee, in violation of 15 U.S.C. § 1681b(b)(2)(A). The AC alleges that the September 15, 2025 "Background Check Consent" Form was not "a document that consists solely of the disclosure" because it combined the disclosure with an acknowledgment and certification, a blanket authorization for "any law enforcement agency" and others "to furnish any and all background information," multi-state notices that still contain unfilled drafting brackets, and a California disclosure. (AC ¶ 97.)

As discussed above, however, TidalHealth ordered the new report before it terminated Plaintiff's employment; she was not a former employee when it was ordered. Also, 15 U.S.C. § 1681b(b)(2)(A)(ii) explicitly states that the written authorization may be included in the disclosure.

*See* 15 U.S.C. § 1681b(b)(2)(A)(ii) (stating that "a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to a consumer, unless -- . . . (ii) the consumer has authorized in writing (***which authorization may be made on the [clear and conspicuous disclosure] document referred to in clause (i)***) the procurement of the report by that person." (emphasis added).) There, is, therefore, no violation by including the authorization with the disclosure, as TidalHealth did here. Moreover, the fact that TidalHealth's disclosure form contains state-specific disclosures does not state a claim. The form clearly delineates what language is state-specific, and the disclosure is clear and conspicuous. Although the Massachusetts and New Jersey state-specific notices contain brackets for inserting descriptions (Exhibit 1), those state-specific notices did not apply to Plaintiff, who had resided in Florida and then moved to Delaware and commuted to work in Maryland. Also, there is nothing in § 1681b that prohibits an authorization from stating that a law enforcement agency or other entities may provide background information requested by a consumer reporting agency.

Finally, even if the form's state-specific notices or third-party language could be read to fall short of the stand-alone disclosure requirement of § 1681b(b)(2)(A)(i), the AC does not plausibly allege that TidalHealth acted with the culpable mental state the FCRA requires. *See Suit*, 2012 U.S. Dist. LEXIS 166560, at *3-4. A willful violation, 15 U.S.C. § 1681n(a), requires more than an erroneous reading of the statute; a defendant does not act willfully where its reading, even if mistaken, is not objectively unreasonable. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 (2007). TidalHealth's use of such a form therefore cannot plausibly constitute a willful violation.

For these reasons, the AC fails to state a FCRA claim upon which relief can be granted and Count II would not survive a motion to dismiss.[5]

### C. Count IV Of The AC, Which Purports To Allege A Wrongful Discharge Claim, Cannot Survive A Motion To Dismiss.

Like the original Complaint, Count IV of the AC purports to plead, in the alternative, a common law wrongful discharge claim based on the alleged "public policy" of Maryland. However, the AC completely changes the theory upon which Count IV is based. The original Complaint alleged that the TCPalm news article about Plaintiff's 2012 arrest in Florida referenced Plaintiff's "judicially expunged record," and that terminating Plaintiff based on that "judicially expunged record" constituted a wrongful discharge in violation of Section 10-109 of the Criminal Procedure Article of the Code of Maryland, which prohibits specific acts with respect to expunged police and court records. As TidalHealth demonstrated in its Motion to Dismiss, the original Complaint failed to state a wrongful discharge claim upon which relief could be granted.

The AC abandons the theory that Plaintiff's record was "expunged." Rather, it claims that Plaintiff's criminal matter was "sealed" by a Florida court in 2016. (AC ¶ 18.) The AC thus admits that the criminal matter was filed in ***Florida*** and that it was a ***Florida court*** that issued the Sealing Order. The criminal matter had nothing to do with Maryland.

Regardless, the AC still attempts to manufacture a wrongful discharge claim based on Maryland public policy. It tries to cobble together a broad Maryland public policy where one simply does not exist. It claims that, "[r]ead together," Sections 10-109 and 10-306(b) of the

---

[5] In addition, it does not appear that Plaintiff has even suffered any injury as a result of the second consumer report. She admits that she was not aware of it until October 9, 2026 (AC ¶ 70), more than six months after her termination. In addition, the AC admits that the report covered employment history only and that TidalHealth supplied the employment information for the report. (AC ¶ 63.) Moreover, regarding her alternative theory that the Background Check Consent form was not a sufficient disclosure, there is absolutely no allegation that Plaintiff did not understand that TidalHealth would retrieve a background check. In fact, the AC acknowledges that the form told her that TidalHealth may obtain information about her for employment purposes. (AC ¶ 67.)

Criminal Procedure Article of the Code of Maryland (which govern expunged criminal charges and shielded convictions, respectively) "protect a person whose criminal records legal process has removed from public view from being compelled to discuss them, or discharged for declining to." (AC ¶¶ 104-06.) It also claims that the Sealing Order was issued by a Florida court and, under the Full Faith and Credit Clause of the United States Constitution and the Full Faith and Credit Act, 28 U.S.C. § 1738, it must be given the same effect in Maryland that it has in Florida. (AC ¶ 107.) For the following reasons, the wrongful discharge claim would not survive a motion to dismiss.

**1. Wrongful Discharge Is A Narrow Exception To At-Will Employment.**

It is well established under Maryland law that "at-will employment can be legally terminated at the pleasure of either party at any time." *Makovi v. Sherwin-Williams*, Co., 316 Md. 603, 609 (1989) (citation and internal quotation marks omitted). Maryland has recognized a limited exception to the employment at will rule and permitted a cause of action for wrongful discharge where the termination of the plaintiff's employment contravenes some "clear mandate of public policy." *Adler v. American Standard Corp.*, 291 Md. 31, 43 (1981). This common law tort constitutes a "narrow exception" to the principle of at-will employment. *King v. Marriott Int'l, Inc.*, 160 Md. App. 689, 699 (2005). Because the exception is narrowly construed, a wrongful discharge claim should be recognized "if at all, only with the utmost circumspection." *Thompson v. Mem'l Hosp.*, 925 F. Supp. 400, 405 (D. Md. 1996) (quoting *Adler*, 291 Md. at 46).

To state a claim for wrongful discharge, a plaintiff must show that: (1) she was discharged; (2) the basis for her discharge violated a specific, clear mandate of public policy; and (3) there is a nexus between her conduct and the employer's decision to fire the employee. *See Verbal v. Giant of Md., LLC*, 204 F. Supp. 3d 837, 842-43 (D. Md. 2016) (citing *Wholey v. Sears Roebuck*, 370 Md. 38, 50-51 (2002)).

Regarding the second element, in order for a mandate of public policy to be sufficiently well-established to form the basis of a wrongful discharge action, there "must be a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation." *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 151 (4th Cir. 2002) (quoting *Porterfield v. Mascari II, Inc.*, 142 Md. App. 134, 788 A.2d 242, 245 (2002)); *see also King*, 160 Md. App. at 701-02. Moreover, a plaintiff *must* "specifically identify" the clear mandate of public policy she alleges was violated. *Terry v. Legato Sys., Inc.*, 241 F. Supp. 2d 566, 569 (D. Md. 2003) (quoting *Szaller*, 293 F.3d at 151).

### 2. The AC Does Not Allege Sufficient Facts To Establish That § 10-109 Or § 10-306(b), Even When Read Together, Contain A Broad Pronouncement Of Public Policy Or That They Even Apply To The Facts Plaintiff Alleged.

Sections 10-109 and 10-306(b), which Plaintiff claims form the basis of the alleged Maryland "public policy," do not contain the broad pronouncement of public policy that the AC alleges they do. Rather, they prohibit very specific conduct, none of which is alleged to have occurred here.

#### a) Section 10-109 Prohibits Certain Conduct With Respect To Police Or Court Records Expunged Under Maryland Law.

Section 10-109(a) states, in part:

> (1) Disclosure of expunged information about criminal charges in an application, interview, or other means may not be required:
>
> (i) by an employer or educational institution of a person who applies for employment or admission;
>
> . . .
>
> (3) Refusal by a person to disclose information about criminal charges that have been expunged may not be the sole reason for:
>
> (i) an employer to discharge or refuse to hire the person;

. . .

Md. Code, Crim. Proc. Art., § 10-109(a).

Section 10-109 is located in Title 10, Subtitle 1 of the Criminal Procedure Article of the Maryland Code, and it must be read in the context of that Subtitle. That Subtitle (§§ 10-101 – 10-112) is called, "Expungement of Police and Court Records." Section 10-101 defines "expunge" as "to remove information from public inspection ***in accordance with this subtitle***," and Section 10-102 states that "[a] police record or a court record is subject to expungement ***under this subtitle***." Md. Code, Crim. Proc. Art., §§ 10-101, 10-102. Subtitle 1 then contains various provisions discussing the circumstances under which a criminal charge can be expunged under Maryland law. *See id.* §§ 10-103 – 10-107. Thus, the expunged records referenced in § 10-109 concern ***police and court records*** that were ***expunged*** in accordance with ***Maryland law***.

The AC, however, does not allege that TidalHealth obtained an expunged police or court record. Rather, it alleges only that Cindy Lunsford, TidalHealth's Executive Vice President/Chief Operations Officer and President, referenced a public internet news article from Florida that is still available to the public at https://archive.tcpalm.com/news/vero-beach-woman-former-stuart-ceo-facing-fraud-and-theft-charges-ep-381976382-342995152.html/.

Nor does the AC allege that Plaintiff's criminal charges were ever ***expunged***, or could even be eligible to be expunged, ***under Maryland law***. Rather, the AC alleges that Plaintiff's criminal matter was ***sealed, not expunged***, and that the sealing occurred under ***Florida law***, specifically Fla. Stat. § 943.059. (AC ¶¶ 18, 108.) Thus, as admitted in the AC, the charges were not brought against Plaintiff in Maryland, and the AC does not allege any facts that plausibly suggest that the charges against Plaintiff were expunged, or eligible to be expunged, under any of the provisions of Title 10, Subtitle 1 of the Criminal Procedure Article of the Maryland Code.

**b) Section 10-306(b) Prohibits Certain Conduct With Respect To Convictions Under Certain Enumerated Maryland Statutes**

Section 10-306(b) states:

> Except as provided in § 10-302(b) of this subtitle, an employer may not:
>
> (i) require a person who applies for employment to disclose shielded information about criminal charges in an application, an interview, or otherwise; or
>
> (ii) discharge or refuse to hire a person solely because the person refused to disclose information about criminal charges that have been shielded.

Md. Code, Crim. Proc. Art., § 10-306(b)(1).

Section 10-306(b) is located in Title 10, Subtitle 3 of the Criminal Procedure Article of the Maryland Code. That Subtitle governs shielding of criminal records and provides that "[a] person may petition the court to shield the person's court and police records relating to one or more shieldable convictions . . ." *Id.* § 10-303(a). Section 10-301, which states the definitions applicable to Subtitle 3, states that the term "'[s]hield' means to render a court record and police record relating to a conviction of a crime inaccessible by members of the public." *Id.* § 10-301(e). As further set forth in Section 10-301, a "[s]hieldable conviction" is a conviction of one of twelve Maryland crimes specifically listed in § 10-301(f). *Id.* § 10-301(f) (listing twelve Maryland crimes). Thus, Subtitle 3 of the Criminal Procedure Article only applies to shieldable ***convictions*** for ***certain enumerated Maryland crimes***.

Section 10-306 has no application here. As the AC admits, Plaintiff was charged in Florida, not Maryland, and the AC states that Plaintiff was not convicted. (AC ¶¶ 18 (stating that "Plaintiff was the subject of a ***Florida*** criminal matter in which she was ***not adjudicated guilty***").) Moreover, the AC does not allege that the Sealed Matter involved any of the offenses enumerated in § 10-301(f), and the news article on which the AC relies reported only fraud and theft charges (Exhibit

2), which are not shieldable offenses under Maryland law. Md. Code, Crim. Proc. Art., § 10-301(f) (excluding fraud and theft from the list of Maryland crimes for which shielding is permitted).

In short, neither § 10-109(a) or § 10-306(b), whether read separately or together, establishes a clear public policy applicable to Plaintiff, and they do not create a broad public policy that protects anyone whose records have been removed from public view by any legal process whatsoever. Rather, they apply only in specific circumstances, which are not present here.

**c) The Full Faith And Credit Clause <u>Does Not Save Plaintiff's Claim.</u>**

Citing Fla. Stat. § 943.059, the AC alleges that the Sealing Order was issued by a Florida court and that "[u]nder Florida law, the Sealing Order removed the records of the Sealed Matter from public access, and Plaintiff may lawfully decline to acknowledge the Sealed Matter to a private employer." (AC ¶¶ 107-08.) The AC claims that, under the Full Faith and Credit Clause of the United States Constitution and 28 U.S.C. § 1738, that Sealing Order must be given the same effect in Maryland that it has under Fla. Stat. § 943.059.

Although the Full Faith and Credit Clause of the United States Constitution and the Full Faith and Credit Act, 28 U.S.C. § 1738, require states and federal courts to respect other states' judgments and proceedings, they do not require one state to adopt another state's laws, nor do they require one state to adopt another state's laws as ***binding public policy***. *See Hester v. Ballard*, 679 Fed. Appx. 273, 279 (4th Cir. 2017) (stating that the Full Faith and Credit Clause "does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate" (quoting *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494 (2003))). Here, Maryland's legislature clearly is competent to legislate regarding what types of criminal records may be expunged or sealed, and when an employer may inquire about those records, and Maryland has done just that by enacting Md. Code, Crim. Proc. Art., §§

10-109 and 10-306(b). The fact that the Maryland statutes do not apply to the facts alleged by Plaintiff does not mean that the Court can simply substitute Florida law in their place, that Florida law can define Maryland public policy, or that Plaintiff can enforce Florida law through a Maryland wrongful discharge claim. In fact, the Fourth Circuit has held that even federal law (which can preempt state law under the Supremacy Clause) does not automatically define state policy. *Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 151 (4th Cir. 2002). It is "Maryland's legislative enactments, prior judicial decisions, and administrative regulations . . . [that] serve as the primary sources of the state's public policy," *id.*, not the laws of another state.

If this Court were to accept Plaintiff's theory, then Maryland public policy would vary depending on the law of the state that handled an employee's prior criminal record. For example, for Plaintiff, Maryland public policy would be based on what is required under the Florida statute, whereas for another employee with a sealing order from another state, Maryland public policy would be based on what is required under that state's laws. This would be the opposite of a clear mandate of Maryland public policy that is required to form the basis of a wrongful discharge claim.

**d) The AC Does Not Allege Facts To Establish That TidalHealth Otherwise Engaged In Any Of The <u>Conduct Prohibited By § 10-109(a) Or § 10-306(b).</u>**

Moreover, nothing in §§ 10-109(a) or 10-306(b) prohibits the conduct alleged in the AC. Section 10-109(a)(1) states that "[d]isclosure of expunged information about criminal charges in an application, interview, or other means may not be required . . . by an employer . . . of a person who applies for employment." Likewise, § 10-306(b) states that "an employer may not … require a person who applies for employment to disclose shielded information about criminal charges in an application, an interview, or otherwise." Here, Plaintiff was not applying for employment when Ms. Lunsford mentioned the article regarding Plaintiff's criminal charges in Florida. Rather, as stated in the AC, the conversation with Ms. Lunsford occurred in March 2026, several months

after Plaintiff commenced employment with TidalHealth in December 2025. (AC ¶¶ 16, 50-53.) There is, therefore, absolutely no allegation that Ms. Lunsford or TidalHealth required Plaintiff to disclose any expunged or sealed information about criminal charges during the application process.

Sections 10-109(a)(3) and 10-306(b) also explain that a person's refusal to disclose information about expunged charges, or shielded charges, respectively, may not be the sole basis for discharging the person. The facts alleged in the AC cannot plausibly establish that Plaintiff was terminated for refusing to disclose information about her criminal record. Although the AC characterizes Plaintiff as having declined to discuss the charges, the only words the AC attributes to Plaintiff are her statements, "You did a background check on me. I passed my background check." (AC ¶¶ 51, 53.) Nor are there any allegations in the AC that Plaintiff told Ms. Lunsford that the criminal matter had been sealed or that Ms. Lunsford or TidalHealth otherwise knew that it had been sealed. The article does not provide any indication that the matter had been sealed (nor could it, given that the article was dated 2012 and Plaintiff's criminal matter was not sealed until 2016, four years later). (Exhibit 2; AC ¶ 18.) TidalHealth therefore could not have terminated Plaintiff for refusing to disclose information about sealed charges it did not know were sealed. Further, §§ 10-109(a)(3) and 10-306(b) apply only where a refusal to disclose is the "sole reason" for the discharge. Even accepting that Count IV is pleaded in the alternative, the AC alleges no facts suggesting that Plaintiff's purported refusal, rather than the other reasons the AC itself identifies (her audit reports and the "operational issues" referenced in her severance documents), was the sole reason for her termination. (*See* AC ¶¶ 54-55, 86.)

Moreover, according to the AC, TidalHealth obtained information regarding Plaintiff's criminal charges not from a formal criminal record but from a publicly available news article. (AC ¶ 51 (stating that Ms. Lunsford "opened a file that contained a printout of a years-old news article

concerning the Sealed Matter"); AC ¶ 111.) There is nothing in §§ 10-109 or 10-306(b) that prohibits an employer's use of publicly available news articles to guide employment decisions.

**e) Maryland Public Policy Simply Does Not Prohibit Reliance On News Articles About Past Criminal Records.**

In summary, the AC simply vaguely alleges that Maryland public policy provides that "a person may not be required to disclose criminal-record information that legal process has removed from public access, and may not be discharged solely for declining to disclose it." (AC ¶ 103.) However, §§ 10-109 or § 10-306(b) do not contain any such clear, broad mandate of public policy.

Maryland courts have repeatedly acknowledged that a public policy mandate must be specific and clear; "[i]t is generally not sufficient to show that the employer violated the 'spirit' or 'intent' underlying a particular law." *McIntyre v. Guild, Inc.*, 105 Md. App. 332, 344 (1995). Rather, a plaintiff must "set forth clear, specific allegations of fact tending to show the employer either (1) violated the legal rule at issue, or (2) punished the employee for exercising some legal right." *Id.* As demonstrated above, the AC does not set forth any facts, much less any clear, specific allegations of fact, tending to show that TidalHealth violated §§ 10-109 or 10-306(b). The Court should not, therefore, declare a violation of public policy where one simply does not exist.

For the above reasons, Count IV would not survive a motion to dismiss.

## V. CONCLUSION

Wherefore, for the foregoing reasons, TidalHealth respectfully requests that this Court deny Plaintiff's Motion for Leave. Should the Court grant the Motion for Leave, TidalHealth respectfully requests that the Court consider the arguments set forth herein as directed to the AC and dismiss Counts I, II, and IV with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), or, alternatively, permit TidalHealth to renew its Motion to Dismiss as to the AC.

Respectfully submitted,

/s/

Larry R. Seegull (Bar No. 22991)
Jill S. Distler (Bar No. 26166)
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
(410) 415-2000 – Telephone
(410) 415-2001 – Facsimile
Larry.Seegull@jacksonlewis.com
Jill.Distler@jacksonlewis.com

*Counsel for Defendant TidalHealth Peninsula Regional, Inc., d/b/a McCready Pavilion*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, Defendant's Opposition To Plaintiff's Motion For Leave To File First Amended Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/
Jill S. Distler

4913-7412-8096, v. 5